SEALED

FILED

SEP 07 2016

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF OKLAHOMA, AND TENNESSEE, ex *rel.* [UNDER SEAL], <br><br> Plaintiffs, <br><br> v. <br><br> [UNDER SEAL] <br><br> Defendants. | No. 14CV-567-CVE-PJC <br><br> FILED IN CAMERA AND UNDER SEAL <br><br> JURY TRIAL DEMAND |

### PLAINTIFFS' FIRST AMENDED COMPLAINT
### PURSUANT TO FEDERAL AND STATE FALSE CLAIMS ACTS

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 West
Suite 217-766
San Antonio, Texas 78257-1160
Telephone: (210) 271-3888
E-Mail: glenn@gglawtx.com

Rand J. Riklin
Texas Bar No. 16924275
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: riklin@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
402 Vale St.
Rollingwood, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

Gaylon C. Hayes
Oklahoma Bar No. 14492
Hayes Legal Group, P.C.
6805 S. Western, Suite 500
Oklahoma City, OK 73139
Telephone: (405) 616-5045
Fax: (405) 616-5062
E-Mail: gaylon@ hhhlawfirm.com

Jason Idell
Texas Bar No. 24055714
Idell PLLC
6800 Westgate Blvd. Suite 132-301
Austin, Texas 78745
Telephone: 512-689-3081
E-mail: jason@idellpllc.com

Wayne Allison, Ok Bar No. 21933
Allison Legal, PLLC
5701 Highland Arbors Dr.
Edmond, OK 73034
405-657-5252; Fax 866-266-2781
E-mail: wayne@allisonlegal.com

ATTORNEYS FOR PLAINTIFFS

Table of Contents

I. INTRODUCTION .................................................................................................. 2

II. PARTIES........................................................................................................... 4

   A. Defendants ................................................................................................ 4

   B. Relator...................................................................................................... 7

III. JURISDICTION AND VENUE ........................................................................ 8

IV. GENERAL BACKGROUND INFORMATION CONCERNING GOVERNMENT-
   FUNDED PRESCRIPTION DRUG BENEFITS ........................................................ 8

   A. Overview of GHP prescription drug reimbursement methodologies ................... 8

   B. Specific GHP prescription drug methodologies illustrating the established, well-known
     understanding and application of U&C price ............................................... 10

     1. Medicaid .......................................................................................... 10

     2. Medicare Part D voluntary prescription drug benefit program........................ 12

     3. FEHBP .............................................................................................. 14

     4. TRICARE and CHAMPUS .................................................................... 15

V. HISTORICAL PERSPECTIVE OF PRESCRIPTION DRUG U&C PRICING AND THE
   EMERGENCE OF PHARMACY DISCOUNT DRUG PROGRAMS................................ 17

VI. DEFENDANTS' U&C PRICE FRAUD .............................................................. 20

   A. Summary description of unlawful acts ......................................................... 20

   B. Moore, OK Rexall Drug, Inc. pharmacy U&C pricing and prescription discount practices
     prior to its acquisition by USA Drug family of pharmacies affiliate Med-X Corporation in
     November, 2009.................................................................................... 21

   C. USA Drug affiliate, Med-X Corporation's, acquisition of the Moore, OK Rexall Drug
     pharmacy in November, 2009, and the implementation of match price discount program and
     U&C pricing scheme in January, 2010 ....................................................... 23

     1. Reporting of fraudulently inflated U&C prices on GHP prescription drug claims: failure
      under applicable GHP reimbursement regulations to consider and include cash discount
      prices in the determination and reporting of U&C price ..................................... 24

     2. Reporting of fraudulently inflated U&C prices on GHP prescription drug claims:
      Impromptu U&C price adjustment increase scheme ....................................... 28

   D. Continuation of match price discount program at USA Drug and affiliated pharmacies after
     they were acquired by Walgreen Co. in September, 2012................................... 29

   E. Representative Examples of Fraudulent Conduct............................................ 31

     1. Fluoxetine ....................................................................................... 32

      a. 2010........................................................................................... 32

      b. 2011........................................................................................... 32

c. 2012...................................................................................................... 33

d. 2012 post-Walgreen acquisition ................................................................ 34

2. Diclofenac 2012 ............................................................................................. 34

a. Example 1 .................................................................................................. 34

b. Example 2 .................................................................................................. 35

3. Pravastatin ...................................................................................................... 36

a. 2010........................................................................................................... 36

b. 2012........................................................................................................... 36

c. 2012 post-Walgreen acquisition ................................................................ 37

4. Warfarin ......................................................................................................... 37

a. 2010........................................................................................................... 37

b. 2012........................................................................................................... 38

c. 2012 Walgreen Ownership Example ......................................................... 39

5. Lovastatin ....................................................................................................... 39

a. 2010........................................................................................................... 39

b. 2011........................................................................................................... 40

c. 2012........................................................................................................... 40

d. 2012 post-Walgreen acquisition ................................................................ 41

6. Lisinopril........................................................................................................ 42

a. 2010........................................................................................................... 42

b. 2011........................................................................................................... 42

c. 2012 post-Walgreen acquisition ................................................................ 43

7. Levothyroxine ................................................................................................ 43

a. 2010........................................................................................................... 43

b. 2011........................................................................................................... 44

c. 2012........................................................................................................... 45

d. 2012 Walgreen Ownership Example ......................................................... 45

8. Cyclobenzaprine ............................................................................................ 46

a. 2010........................................................................................................... 46

b. 2011........................................................................................................... 46

c. 2012........................................................................................................... 47

d. 2012 post-Walgreen acquisition ................................................................ 48

9.  Finasteride - 2012 .................................................................................................. 48

10. Isosorbide Mononitrate - 2011 ............................................................................. 49

11. Paroxetine - 2012 ................................................................................................ 49

F.  High Volume, Low Spread Representative Examples....................................................... 50

1.  Metoprolol Tartrate ...................................................................................................... 50

   a.   2010............................................................................................................. 50

   b.   2011............................................................................................................. 51

   c.   2012............................................................................................................. 51

   d.   2012 post-Walgreen acquisition ................................................................. 52

2.  Atenolol........................................................................................................................ 53

   a.   2010............................................................................................................. 53

   b.   2011............................................................................................................. 53

   c.   2012............................................................................................................. 54

   d.   2012 post-Walgreen acquisition ................................................................. 54

G.  Non-Formulary Percentage Discount Representative Examples........................................ 55

1.  2010 Examples............................................................................................................. 55

   a.   Pantoprazole................................................................................................ 55

   b.    Propranolol.................................................................................................. 56

   c.   Cefdinir ....................................................................................................... 57

2.  2011 Examples............................................................................................................. 57

   a.   Zolpidem...................................................................................................... 57

   b.   Tizanidine .................................................................................................... 58

   c.   Tamsulosin ................................................................................................... 59

   d.   Bupropn HCL............................................................................................... 59

   e.   Metoprolol Succ. ......................................................................................... 60

   f.   Morphine Sul ............................................................................................... 61

3.  2012 Examples............................................................................................................. 61

   a.   Clopidogrel .................................................................................................. 61

   b.   Diazepam ..................................................................................................... 62

   c.   Gabapentin ................................................................................................... 63

H. Brand Drug Representative Examples ............................................................................ 64

1.  Qualaquin ..................................................................................................................... 64

2. Enablex .................................................................................................................. 64

3. Lantus Insulin.......................................................................................................... 65

4. Levemir Flex Pen..................................................................................................... 66

VII. COUNT ONE – FCA §3729(a)(1)(A)............................................................................ 66

VIII. COUNT TWO – FCA §3729(a)(1)(B)........................................................................... 67

IX. COUNT THREE – VIOLATIONS OF STATE LAWS...................................................... 67

X. JURY DEMAND ............................................................................................................. 68

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF OKLAHOMA, AND TENNESSEE, ex *rel*. CHRIS PHILLIPS,<br><br>    **Plaintiffs,**<br><br>v.<br><br>**1. STEPHEN L. LAFRANCE HOLDINGS, INC.,**<br>**2. SUPER D DRUGS ACQUISITION CO.,**<br>**3. STEPHEN L. LAFRANCE PHARMACY, INC.,**<br>**4. ARCADIA VALLEY DRUG CO.,**<br>**5. CONSOLIDATED STORES, INC., DALECO, INC.,**<br>**6. PHARM-MART PHARMACY OF WARREN, INC.,**<br>**7. RICH MOUNTAIN PHARMACEUTICAL SERVICES, INC.,**<br>**8. S & W PHARMACY, INC.,**<br>**9. USA DRUG & BEAUTY MARKET FRANCHISING SYSTEM, INC.,**<br>**10. MAY'S DRUG STORES, INC.,**<br>**11. MED-X CORPORATION, AND**<br>**12. WALGREEN CO.,**<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.  14CV-567CVE-PJC<br><br>FILED IN CAMERA AND UNDER SEAL<br><br>JURY TRIAL DEMAND |

### PLAINTIFFS' FIRST AMENDED COMPLAINT
### PURSUANT TO FEDERAL AND STATE FALSE CLAIMS ACTS

Chris Phillips (**"Relator"**) files this First Amended Complaint on behalf of the United States of America (**"USA"**) and the States of Oklahoma and Tennessee (**collectively referenced as "States" or "Plaintiff States"**) against Stephen L. LaFrance Holdings, Inc., Super D Drugs Acquisition Co., Stephen L. LaFrance Pharmacy, Inc., Arcadia Valley Drug Co., Consolidated

Stores, Inc., Daleco, Inc., Pharm-Mart Pharmacy of Warren, Inc., Rich Mountain Pharmaceutical Services, Inc., S & W Pharmacy, Inc., USA Drug & Beauty Market Franchising System, Inc., May's Drug Stores, Inc., Med-X Corporation, and Walgreen Co. (**collectively, "Defendants"**), and alleges the following:

## I.
## INTRODUCTION

1. Relator brings this action pursuant to the Federal False Claims Act (**"FCA"**), 31 USC §3729 et seq., and the analogous Plaintiff State false claims and health care fraud remedial statutes (**"Plaintiff State false claim statutes"**). The pertinent Plaintiff State false claim statutes are as follows:

     a.   <u>Oklahoma</u>:   63 O.S. 5053 *et seq.*, Oklahoma Medicaid False Claims Act.

     b.   <u>Tennessee</u>:   4-18-101 *et seq.*, Tennessee False Claims Act;
                              71-5-181 *et seq.*, Tennessee Medicaid False Claims Act

2. Each of the Federal and State false claims statutes referenced in the foregoing paragraph authorize private persons to bring a civil action for the person and the applicable governmental entity against a person who commits one or more acts in violation of the particular false claims statute. Remedies include the recovery of a civil penalty for each false claim violation (not less than $5,500 and not more than $11,000 under the FCA) and multiple damages based on a single damages multiplier (e.g., treble damages under the FCA). As an award, the Relator is entitled to receive a percentage of the proceeds of the action or settlement of the claim(s) (Under the FCA, generally 15% to 25% if the USA exercises its election to intervene and assume control of the action and 25% to 30% if the USA does not intervene and the Relator proceeds with the action). In the event of a recovery, the Relator is also entitled to receive an award against the Defendant(s) for reasonable expenses, plus attorneys' fees and costs.

3.   Defendants' unlawful acts in violation of the FCA and State false claims statutes, as alleged below, concern their submission of false claims to Federal and State health care programs for prescription drugs furnished to program beneficiaries, and their use of materially false records and statements in support of those false claims.   More specifically, Defendants have knowingly submitted fraudulent, inflated pricing information to government health care programs on tens of thousands of prescription drug claims, for the purpose of unlawfully obtaining reimbursement payments higher than those authorized by law.

4.   In addition to USA non-Medicaid and USA and State Plaintiff Oklahoma and Tennessee Medicaid claims, Relator's claims on behalf of the USA include claims for the federal share of damages concerning FCA violations relating to Medicaid programs in each State where Defendants have operations and i) the State has an analogous act or statute which does not authorize *qui tam* actions by private persons, but has provisions under which an award may potentially be recovered, ii) the State has an analogous act or statute which does not authorize *qui tam* actions and under which there is no potential award provision,  iii) the State does not have an analogous act or statute, and iv) the State, e.g., New Jersey, has an analogous act or statute, but Defendants do not have a material presence in the State.   Because each State Medicaid program is jointly funded by the USA and a particular State, each FCA false claim violation by Defendants against a State Medicaid program is a false claim against the USA for the federal share of the false claim amount.   The following is a list of the States, in addition to the USA and Plaintiff State Oklahoma and Tennessee Medicaid claims, for which Relator seeks to recover the federal share of Medicaid false claim recoveries, along with an award from any proceeds and statutory expenses costs, and attorneys' fees against Defendants:

Analogous act or statute that does not allow *qui tam* action, but provides for potential award

3

a. <u>Arkansas</u>:    A.C.A. 20-77-901 *et seq.,* Arkansas Medicaid Fraud False Claims Act.

b. <u>Missouri</u>:    191.900 *et seq.*, Missouri Health Care Payment Fraud and Abuse Act.

<u>Analogous act or statute that does not allow *qui tam* action or award</u>

c. <u>Kansas</u>:    K.S.A. 21-3844 *et seq*., Kansas Medicaid Fraud Control Act.

d. <u>Mississippi</u>:    43-13-201 *et seq*., Mississippi Medicaid Fraud Control Act.

<u>Analogous act or statute, but no current, material presence of Defendants in State</u>

e. <u>New Jersey</u>:    N.J.R.S. 2A:32C-1 et seq., New Jersey False Claims Act.

## II.
## PARTIES

### A. Defendants

5.  Defendant, Stephen L. LaFrance Holdings, Inc., and various affiliated companies more fully identified below own a chain of approximately 144 drugstores and pharmacies located in Arkansas, Kansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee.  In or about September 2012 Stephen LaFrance Holdings, Inc. and certain of its affiliates were purchased by Walgreen Co.  Defendants operate under the names USA Drug, Super D Drug, May's Drug, Med-X, Drug Warehouse, Walgreens, and various other names, including those identified below.

6.  Defendant Stephen L. LaFrance Holdings, Inc. is a Delaware corporation that may be served through its registered agent, Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington DE 19808 (phone: 302 636 5401).

7.  Defendant Super D Drugs Acquisition Co. is a Delaware corporation with its principal place of business at 3017 N. Midland Dr., Pine Bluff AR 71603-4828.  It may be served through its registered agent, Corporation Service Company, 115 SW 89th St, Oklahoma City, OK 73139-8511.  Super D Drugs Acquisition Co. does business under numerous fictitious names, including but not limited to, the following: Oak Park Drugs, Osceola Pharmacy, South Park Pharmacy, Star

4

Pharmacy, Super D Drugs, Super D Express RX, Super RX, USA Drug, USA Drug Express, Waldron Drug #15797 Powered by Walgreens, Walgreens #15702, Walgreens #15703, Walgreens #157147, Walgreens #15788, Walgreens #15789, Walgreens #15790, Walgreens #15791, Walgreens #15792, Walgreens #15793, Walgreens #15794, Walgreens #15797, Walgreens #15819, and Walgreens # 15852.

8. Defendant Stephen L. LaFrance Pharmacy, Inc. is an Arkansas corporation that may be served through its registered agent, Corporation Service Company, 115 SW 89th St, Oklahoma City, OK 73139-8511. Stephen L. LaFrance Pharmacy, Inc. does business under the following fictitious names: Alternative Care, Family Drugs, USA Drug, USA Drug Express, USA Drug Express #15819, Walgreens #15361, Walgreens #15819, and Walgreens #15830.

9. Defendant Arcadia Valley Drug Co. is an Arkansas corporation with its principal place of business at 1 Allied Dr., Ste. 1720, Little Rock, AR 72202-2013.

10. Consolidated Stores, Inc. is an Arkansas corporation that may be served through its registered agent, Corporation Service Company, 300 S. Spring St., Ste. 900300, Little Rock, AR 72201-2444. Consolidated Stores, Inc. does business under the following fictitious names: USA Drug and Walgreens #15721.

11. Daleco, Inc. is an Arkansas corporation that may be served through its registered agent, Walter M. Ebel, 2000 W. Regions Center, 400 Capitol Ave., Little Rock, AR 72201.

12. Pharm-Mart Pharmacy of Warren, Inc. is an Arkansas corporation that may be served through its registered agent, Corporation Service Company, 300 S. Spring St., Ste. 900300, Little Rock, AR 72201-2444. Pharm-Mart Pharmacy of Warren, Inc. does business under the following fictitious names: USA Drug and Walgreens #15817.

5

13. Rich Mountain Pharmaceutical Services, Inc. is an Arkansas corporation that may be served through its registered agent, Corporation Service Company, 300 S. Spring St., Ste. 900300, Little Rock, AR 72201-2444.  Rich Mountain Pharmaceutical Services, Inc. does business under the following fictitious name: Med-Ark Pharmacy.

14. S & W Pharmacy, Inc. is an Arkansas corporation that may be served through its registered agent, Corporation Service Company, 300 S. Spring St., Ste. 900300, Little Rock, AR 72201-2444. S & W Pharmacy, Inc. does business under the following fictitious name: USA Drug.

15. USA Drug & Beauty Market Franchising System, Inc. is an Arkansas Corporation that does business under the following fictitious names: Rx Express Pharmacy and USA Drug .

16. May's Drug Stores, Inc. is an Oklahoma corporation that may be served through its registered agent, Corporation Service Company, 115 SW 89th St, Oklahoma City, OK 73139-8511. May's Drug Stores, Inc. does business under the following trade names: Mor-Val Healthcare, The Drug Warehouse, Walgreens #15751, Walgreens #15756, Walgreens #15762, Walgreens #15763, Walgreens #15764, Walgreens #15770, Walgreens #15772, Walgreens #15773, Walgreens #15778, Walgreens #15780, Walgreens #15810, Walgreens #15811, Walgreens #15812, and Walgreens #15808.

17. Med-X Corporation is an Oklahoma corporation that may be served through its registered agent, Corporation Service Company, 115 SW 89th St, Oklahoma City, OK 73139-8511.  Med-X Corporation does business under the following trade names: Drug Mart, Moore Rexall Drug, Walgreens #15776, Walgreens #15777, Walgreens #15782, and Walgreens #15809.

18. Walgreen Co. is an Illinois corporation that may be served through its registered agent, The Prentice-Hall Corporation System, Oklahoma, Inc., 115 SW 89th St, Oklahoma City, OK 73139-8511.

## B.  Relator

19. Relator Chris Phillips is a citizen of the United States and a resident of the State of Oklahoma.  Relator holds a Doctor of Pharmacy degree from the University of Oklahoma and is a licensed pharmacist in the State of Oklahoma.  Currently, Relator owns and operates Express Drug LLC d/b/a Chris' Express Drug in Oklahoma City, OK.

20. In August 1998, Relator began working as a pharmacy technician at Moore Rexall Drug, Inc., located at 621 N. Broadway in Moore, OK.  He advanced to pharmacy intern in August 1999 when he entered pharmacy school, and graduated to pharmacist when he obtained his pharmacist license in 2003.

21. In November, 2009, the Moore Rexall Drug Inc. pharmacy was acquired by USA Drug affiliate Med-X Corporation, and Relator was retained and designated as the Pharmacist in Charge. For a time after the acquisition the pharmacy continued to do business as Moore Rexall Drug Inc., although within the USA Drug and Med-X family of pharmacies it was referred to as Med-X Drug #6142.  In October, 2011, the physical location of the pharmacy was moved down the block to 601 N. Broadway, and the store was officially renamed "Med-X."

22. In or about September, 2012, Walgreen Co. acquired the USA Drug family of pharmacies, including Med-X Corporation and various affiliates of Med-X Corporation named as defendants in this complaint.  After the acquisition Relator continued as the Pharmacist-in-Charge **(P-I-C)** at the Med-X #6142 location until it was officially closed in or about October 22, 2012 as part of the Walgreen Co. post-acquisition reorganization and transition of the USA Drug and affiliated pharmacies.  All files from that location were merged with and moved to Walgreens #5738, 1229 N. Eastern, Moore, OK.   Relator's termination date was November 11, 2012.   The time gap between the store closure and Relator's termination was due to a notice of termination requirement.

## III.
## JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730 (b). This court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). This court also has supplemental jurisdiction over the state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

24. Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because one or more of the Defendants transact business in this Judicial District.

25. Relator believes there has been no public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the court determine otherwise, the Relator is an original source of the information on which the allegations in this complaint are based, as defined in FCA §3730(e)(4)(B). As a member of the pharmacy profession and former Med-X Corporation pharmacist before and after Walgreen Co.'s acquisition of the USA DRug family of stores, Relator has knowledge and information which is not publicly available.

## IV.
## GENERAL BACKGROUND INFORMATION CONCERNING
## GOVERNMENT-FUNDED PRESCRIPTION DRUG BENEFITS

26. Federal and State government health care programs (**"GHP" in the singular form and "GHPs" in the plural form**), including Medicare, Medicaid, Tricare (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), and The Federal Employees Health Benefits Program, among others, offer pharmaceutical benefits to their respective beneficiaries.

## A. Overview of GHP prescription drug reimbursement methodologies

27. By law, GHPs that reimburse providers such as Defendants for prescriptions dispensed to program beneficiaries generally pay an amount for each covered drug that is limited to the *lesser of*:

8

   a.  the pharmacy provider's usual and customary (**"U&C"**) price; or

   b.  one or more alternative price types (**"APT" in the singular, and "APTs" in the plural, form**).

28. GHPs generally define the U&C price, in substance, as the price that a pharmacy charges a customer who does not have, or elects not to use, any form of prescription drug insurance coverage. Customers who do not have or use insurance coverage to purchase prescription drugs are commonly referred to as **"cash customers,"** and the related drug sales and purchases are commonly known as **"cash transactions."**

29. Pharmacy providers have a legal duty as a condition of payment, when submitting claims for prescription drugs to GHPs with reimbursement regulations which limit payment to the lesser of U&C price and alternative APTs and define U&C price in terms of cash prices or include cash prices in its determination, to either i) report the pharmacy's prices to cash customers as its U&C prices, or ii) determine and report the pharmacy's U&C prices based on the particular GHP's U&C price definition.

30. Examples of APTs included in GHP reimbursement methodologies which are used as the basis for reimbursement when an APT is lower than the pharmacy reported U&C price are as follows:

   a.  <u>Negotiated Price, plus Dispensing Fee</u>.  With respect to the Medicare Part D program, Negotiated prices are the costs for prescription drugs agreed upon through direct negotiation between the Part D plan sponsor, or an intermediary organization such as a pharmacy benefit manager (a third party administrator that processes and pay claims for drug plans), and the drug manufacturer;

   b.  <u>Contracted price, plus Dispensing Fee</u>.  Contracted prices are the costs for prescription drugs agreed upon through direct negotiation between a GHP or its contractor, e.g., an intermediary organization such as a pharmacy benefit manager (third party administrators that process and pay claims for drug plans), and the pharmacy provider;

c. <u>Estimated Acquisition Cost ("EAC"), plus Dispensing Fee</u>.  EAC is a State Medicaid agency's estimate of the price generally and currently paid by providers, *e.g.*, pharmacies, calculated according to the agency's established rules and regulations;

d. <u>Federal Upper Limit ("FUL"), plus Dispensing Fee</u>.  Federal Medicaid regulations establish an upper limit on the amount State Medicaid programs may pay for   certain multiple source drugs, that is, brand drugs with available generic drugs; or

e. <u>Maximum Allowable Cost ("MAC"), plus Dispensing Fee</u>.  State Medicaid agencies and other GHPs also have had and have the discretion to establish State upper limit APTs.

31. As indicated, APTs consist of two components.  The first component, the negotiated price, contracted price, EAC, FUL, or MAC, is intended to reimburse the ingredient cost of a drug.  The second component, the dispensing fee, is intended to reimburse the pharmacy for pharmacy operation costs, including, but not limited to, costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measuring or mixing the covered outpatient drug, filling the container, counseling the beneficiary, physically providing the completed prescription to the beneficiary, delivery, special packaging, and overhead associated with maintaining the facility and equipment necessary to operate the pharmacy.

32. With respect to GHPs with reimbursement methodologies that provide for the payment of the lesser of U&C price or an APT, the GHP compares the U&C price with no dispensing fee charge against the APTs, each APT consisting of both the ingredient cost, plus a dispensing fee.

**B. Specific GHP prescription drug methodologies illustrating the established, well-known understanding and application of U&C price**

**1. Medicaid**

33. Medicaid is a joint and voluntary program between the federal government and the states, whereby lower-income, disabled and elderly individuals are offered basic healthcare coverage, including prescription drug benefits.

10

34. The Federal government pays a share of the medical assistance expenditures under each state's Medicaid program.

35. Since at least 1976, the Medicaid rules have divided reimbursable drugs into two categories: i) multiple source drugs subject to a FUL, and ii) other drugs.  Multiple source drugs have been subjected to a FUL when there are multiple equivalent drugs and suppliers.  "Other drugs" include single-source drugs, certified brand drugs (i.e., physician certification brand is medically necessary for particular recipient), and drugs other than multiple source drugs for which a FUL has been established.

36. During the same time period, Medicaid rules have provided that State agency payments for other drugs must not exceed in the aggregate, payment levels the agency has determined by applying the lower of the following costs and charges:

a.  EAC plus a reasonable fee established by the agency; or

b.  The provider's usual and customary charges to the general public.

37. The FUL is just that, an upper limit, and the State agency will pay the EAC plus a dispensing fee or the U&C price of a multi-source drug, if it is lower than the FUL.

38. Accordingly, the Medicaid reimbursement methodology for all covered drugs can be summarized to provide for the payment of the lesser of the following costs, charges, or limits:

a.  The provider's usual and customary charge to the general public;

b.  EAC plus a reasonable dispensing fee established by the State agency;

c.  State MAC, if any, plus a reasonable dispensing fee; or

d.  FUL, if any, plus a reasonable dispensing fee.

39. Several Medicaid programs define U&C prices as the pharmacy's prices to cash customers, while others define U&C price based on the pharmacy's prices to both cash and privately insured

customers.  In either case, pharmacy providers have a legal duty as a condition of payment to accurately determine and report their true U&C prices when submitting claims to GHPs.

**2.  Medicare Part D voluntary prescription drug benefit program**

40. The voluntary prescription drug benefit program for Medicare enrollees is known as **Medicare Part D ("Part D")**.  Part D was enacted into law on December 8, 2003 and became available to beneficiaries beginning on January 1, 2006.

41. Coverage for the Part D drug benefit is provided under private prescription drug plans ("PDP" in the singular, and "PDPs" in the plural, form).  Medicare contracts with private entities, known as Part D Plan "sponsors," to administer prescription drug plans.

42. CMS regulations require that PDP providers such as Defendants offer Medicare beneficiaries their PDP sponsor's Negotiated Prices. Negotiated Prices are prices for covered Part D drugs that— (1) The Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug; (2) Are reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) Includes any dispensing fees.  42 CFR § 423.100.  Failure to offer Negotiated Prices occurs when a pharmacy charges a beneficiary the wrong amount, such as failing to offer Medicare beneficiaries available discounts or price concessions at the point of sale.

43. When a pharmacy - such as one of Defendants' pharmacies - dispense drugs to a Medicare beneficiary, the pharmacy submits an electronic claim to the beneficiary's PDP sponsor or PBM and receives reimbursement from the PDP for the costs that are not paid by the beneficiary (co-payment). The PDP sponsor then notifies the CMS that a drug has been purchased and dispensed

through a document called a Prescription Drug Event ("PDE") record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy. Payments to the PDP sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program as set forth in 42 C.F.R. § 423.322. Essentially, each PDE submitted to CMS is a summary record documenting the final adjudication of a dispensing event based upon claims received from pharmacies and the data in PDEs are data related to the payment of claims.

44. Throughout the year, CMS makes prospective payments to PDP sponsors for three subsidies based on the sponsors' approved bids: (1) the direct subsidy designed to cover the sponsor's costs of providing the benefits; (2) the low-income cost-sharing subsidy; and the reinsurance subsidy. PDP sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return monthly payments to CMS during reconciliation. See 42 C.F.R. § 423.343(b), (c)(2) and (d)(2). After the close of the plan year, CMS is responsible for reconciling the prospective payments to the PDP sponsor's actual allowable costs to calculate final payments and risk sharing amounts. CMS determines the actual allowable costs by relying upon data elements submitted by PDP sponsors in their PDE records.

45. Defendants, as subcontractor providers for PDP sponsors, are required to comply with all applicable federal laws, regulations and CMS instructions which includes the obligation to offer Medicare beneficiaries Negotiated Prices. 42 C.F.R. § 423.505(i)(4)(vi). Moreover, a PDP sponsor is obligated by federal regulation to certify the accuracy, completeness and truthfulness of all data related to the payment:

> (1) General Rule. As a condition for receiving a monthly payment ... the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on

best knowledge, information and belief) the accuracy, completeness, *and truthfulness of all data related to payment.* The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies. (Emphasis added).

. . .

(3) Part D Sponsor Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (Based on best knowledge, information and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (3).

46. The "Certification of data that determines payments" provision of the applicable

regulation further provides:

"[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."

42 C.F.R. § 423.505(k)(3).

47. By failing to offer Medicare beneficiaries available point of sale discounts and price

concessions, Defendants submitted false requests for payment to PDP sponsors at inflated

Negotiated Prices. Accordingly, Defendants knowingly caused the PDP sponsors to submit false

and fraudulent claims for payment to CMS. That the PDP sponsors filed the claims with CMS is

irrelevant because liability attaches to any person who "causes to be presented" a false or

fraudulent claim. The Defendants' knowingly "caused the claim" to be presented by the PDP

sponsors who then sought payment from the government.

**3. FEHBP**

48. The Federal Employees Health Benefits Program **("FEHBP")** offers comprehensive group

health insurance to federal employees, retirees and their eligible family members through a wide

variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("OPM").

49. Since at least 2006, FEHBP plans have been PBM Caremark's largest customers (The reference to "Caremark" includes its successor "CVS/Caremark").  The majority of FEHBP claims are processed by Caremark.

50. Pursuant to the Caremark 2007 and 2009 manuals, FEHBP prescription drugs processed have been reimbursed at the lower of:

   a. Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP [Average Wholesale Price] minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount);

   b. MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount;

   c. Ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; or

   d. Provider's U&C price less the applicable Patient Pay Amount.

51. The 2007 and 2009 manuals define "Usual and Customary Price or U&C" as "the lowest price Provider would charge a particular customer if such customer were paying <u>cash</u> for an identical prescription on that particular day at that particular location.  This price must include any applicable discounts offered to attract customers." (emphasis added).

## 4.  TRICARE and CHAMPUS

52. TRICARE and CHAMPUS are the managed health care programs established by the Department of Defense ("DoD") for active duty service members, active duty family members, retired service members and families, and certain other eligible beneficiaries.

53. Since June 1, 2004 to the present, **Pharmacy Benefit Manager ("PBM")**[1] Express Scripts has operated the TriCare Retail Pharmacy contract for all TRICARE beneficiaries located in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam, except for beneficiaries enrolled in one particular plan which is not material to this action.

54. Pursuant to the Express-Scripts pharmacy manual, Express-Scripts' TRICARE reimbursement methodology is as follows:

    a.  For Generic Drugs or Multi-Source Brand Drugs, Express-Scripts will pay the lesser of:

        i.  AWP Generic Drugs or Multi-Source Brand Drugs ingredient cost minus contracted Generic Drug discount plus contracted Generic Drug dispensing fee for the applicable network; OR

        ii.  MAC discount plus contracted Generic Drug dispensing fee for applicable network; OR

        iii.  Network Provider-submitted ingredient cost plus contracted Generic Drug dispensing fee for applicable network; OR

        iv.  Usual and Customary Retail Price; OR

        v.  If applicable, special Sponsor reimbursement logic; OR

        vi.  State Fee Schedule *(e.g.,* Workers' Compensation).

    b.  For Single-Source Brand Drugs, Express-Scripts will pay the lesser of:

        i.  AWP ingredient cost minus contracted brand discount plus contracted brand dispensing fee for the applicable network; OR

        ii.  Network Provider submitted brand ingredient cost plus contracted brand dispensing fee; OR

        iii.Usual and Customary Retail Price; OR

        iv.If applicable, specific Sponsor reimbursement; OR

---

[1] A PBM is a third party administrator primarily responsible for processing and paying prescription drug claims for plan sponsor groups, such as managed-care organizations, insurance carriers, employers, and union-sponsored benefit plans.

    v.  State Fee Schedule *(e.g.,* Workers' Compensation)

55. The Express-Scripts pharmacy manual defines "Usual and Customary Retail Price (U&C)" as follows: "To the extent no [sic] defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a <u>cash transaction</u> at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, <u>inclusive of</u> "loss leaders", frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date. Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers including Members." (Emphasis added).

## V.
## HISTORICAL PERSPECTIVE OF PRESCRIPTION DRUG U&C PRICING AND THE EMERGENCE OF PHARMACY DISCOUNT DRUG PROGRAMS

56. Historically, the same as today, GHP and private insurer drug reimbursement methodologies, as a rule, have provided for the payment of the lower of U&C price or one or more APTs.

57. Retail pharmacies, in response, traditionally have set U&C prices to cash customers at amounts materially exceeding many, if not most, corresponding APT prices, in the absence of competitive pressures. This is because the GHP and private insurer transactions outnumber sales to cash customers and, as a consequence, setting U&C prices below the highest available APTs would result in significant loss of revenue to a pharmacy.

58. For these reasons, pharmacies were rarely reimbursed by GHPs and private insurers at the retail pharmacies' historically high, every day U&C prices to cash customers. Retail pharmacies were virtually always reimbursed at the lesser APT reimbursement formula rates.

17

59. The historical U&C pricing model underwent a drastic, game-changing makeover when, beginning in approximately May 2006, closely following the implementation of Medicare Part D prescription drug coverage earlier that year, Kmart and Walmart introduced and popularized the first discount generic drug programs.  Kmart initially established a discount formulary specifically identifying and listing i) some 300 generic maintenance drugs at commonly prescribed dosages which it offered in a 90 count supply for $10, $15 or $25 and ii) select acute drugs which it offered in a 30 count supply for $5.  By the late fall, Walmart had established a nationwide discount program and formulary which offered 30 count supplies of more than 300 drugs for $4.  Before the end of 2006, Kmart expanded its 30 count discount program to compete with Walmart.

60.  By late 2006 or early 2007, many other pharmacy chains, including Target and Kroger had instituted competitive discount drug programs.   Almost all pharmacies now have discount programs which offer 30 count drug supplies for approximately $5 and 90 count supplies for approximately $10 or $15.  In addition, many offer percentage or other discounts on all other generic drugs which are not specifically identified and listed in any discount formulary (non-formulary drugs) and all brand-name drugs.

61. As a result of the emergence of discount drug programs, hundreds of commonly prescribed drugs are now sold to cash customers across the nation, every day, at U&C prices materially below APTs included in GHP and private insurer reimbursement methodologies, counter to the historical U&C pricing model.

62. Pursuant to most GHP reimbursement methodologies and U&C price definitions, pharmacies are legally obligated to report the every-day cash prices at which they sell drugs under their discount drug programs as their actual U&C prices on prescription drug claims to GHPs.

63. This principle was clarified in an October 11, 2006 memorandum to all part D sponsors from

18

the CMS Director of the Medicare Drug Benefit Group on the subject "Lower Cash Price Policy"

(October 2006 CMS Memo).  The memo confirmed that every-day, reduced prices are considered a

pharmacy's U&C prices under the Part D benefit design.  In this respect the memo stated as follows:

> We note that in cases where a pharmacy offers a lower price to its customers throughout a
> benefit year, this would not constitute a 'lower cash price' situation that is the subject of this
> guidance. For example, Wal-Mart recently introduced a program offering a reduced price for
> certain generics to its customers. The low Wal-Mart price on these specific generic drugs is
> considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower
> cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will
> reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated
> price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose
> Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the
> $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price,
> because it is not a one-time special price. The Plan will adjudicate Wal-mart's claim for $4
> and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both
> the Plan and the beneficiary are benefitting from the Wal-mart 'usual and customary' price,
> and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D
> benefit design. Therefore, the beneficiary can access this discount at any point in the benefit
> year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not
> need to send documentation to the plan to have the lower cash price count toward the TrOOP
> [True Out-of-Pocket costs].

64. Consistent with the directive of the October 2006 CMS Memo, Relator has been informed

by Walmart pharmacists that Walmart reports its $4 cash discount prices as its U&C prices on

claims submitted for payment to GHPs, thereby giving GHPs the benefit of the discount prices it

charges to its other customers and payers.

65. In those instances where a State Medicaid program defines U&C price in terms broader

than the price charged in a cash transaction, including all discounts and promotions, e.g., the

average charge to all customers, the pharmacy provider has a legal duty as a condition of payment

to accurately determine and report its true U&C prices based on the applicable definition.

# VI.
## DEFENDANTS' U&C PRICE FRAUD

### A. Summary description of unlawful acts

66. Since at least January, 2010 and continuing through the present, Defendants have knowingly and systematically defrauded GHPs by knowingly engaging in the pattern and practice of disregarding the every-day, discounted prices they charge cash customers for certain pharmaceuticals when determining the U&C prices they represented and reported to GHPs for reimbursement purposes. Defendants have presented, and continue to present, false and fraudulent claims to GHPs which include falsely reported, inflated U&C prices, in order to obtain larger amounts in reimbursement.   Consequently, Defendants were reimbursed, and continue to be reimbursed, for certain pharmaceuticals at amounts that clearly exceed their U&C prices.

67. Defendants' claims for payment to GHPs for discount drugs furnished to GHP beneficiaries were false, because GHP prescription drug reimbursement rules generally provide for the payment of the lesser of a provider's U&C price and one or more APTs.   Defendants knowingly concealed their true U&C prices, which were materially lower than APTs, and reported false, inflated U&C prices to GHPs that were higher than APTs, in order to obtain payments that were excessive under reimbursement rules.

68. GHPs paid Defendants' false claims for discount prescription drugs furnished to GHP beneficiaries based on the false set of facts, i.e., that Defendants' U&C prices were higher than other applicable APTs, and GHPs would not have paid such claims if they had known the true state of facts.

69. As a result of Defendants' fraudulent conduct, GHPs unwittingly paid to Defendants, and Defendants fraudulently collected from GHPs, excessive reimbursements based on APTs higher than Defendants' true, lower U&C prices.   Defendants engaged in this scheme with regard to a)

drugs price matched to competitor pharmacies' $4 formulary, and b) non-formulary percentage discounts.

70. Defendants' fraudulent scheme has caused GHPs to pay Defendants significantly higher reimbursement amounts than they were, and are, entitled to receive under federal and state laws and regulations for prescriptions filled for GHP beneficiaries.

71.     Beginning in the spring and continuing at least until the fall of 2012, Defendants knowingly and systematically defrauded GHPs through a second U&C pricing scheme.  Pursuant to the second scheme, if a third party payer, including a GHP, paid the Defendants' fraudulently reported inflated  U&C price on an initial claim,  Defendants' reversed the initial claim and re-submitted a new claim with an impromptu, contrived, substantially higher U&C price gauged to capture every available dollar under the payer's reimbursement methodology.

72. Defendants have submitted many thousands of false claims for prescriptions they filled for GPH beneficiaries, based on the number of pharmacies Defendants operate, the number of generic drugs and brand-name drugs involved, the number of GHP prescription drug transactions at each pharmacy, and the covered time period, which began in as early as 2009 and is ongoing.

**B. Moore, OK Rexall Drug, Inc. pharmacy U&C pricing and prescription discount practices prior to its acquisition by USA Drug family of pharmacies affiliate Med-X Corporation in November, 2009**

73.     Relator has personal knowledge of the operations of the Moore, OK Rexall Drug pharmacy prior to its acquisition by USA Drug affiliate Med-X Corporation in November, 2009. His personal knowledge is based on his continuous employment at the Moore, OK Rexall Drug pharmacy from approximately August 1998 through the acquisition date.  As outlined above in Section II.B., he started as a pharmacy technician, advanced to pharmacy intern, and in 2003 became a licensed pharmacist.

74.     Prior to its acquisition by USA Drug in November, 2009, the Moore, OK Rexall Drug pharmacy did not offer a set, every day discount prescription drug program open to all customers.

75.     As a general rule, Moore, OK Rexall Drug followed the historical prescription drug pricing model described in Section V and set its U&C prices materially higher than the APT prices paid by third party payers, including GHPs.

76. However, when the Rexall Drug pharmacy's established U&C price for a particular drug was much higher than local competitor prices to cash customers, in an attempt to maintain customer satisfaction, pharmacists had the discretion to offer and issue a free "True Care" discount card to a cash customer and reduce the price.  These discretionary discounted prices were offered on an infrequent basis, Relator estimates less than 1% of prescription sales, and the Rexall Drug pharmacy discounted price was routinely set at the discretion of the pharmacist somewhere between the Rexall Drug pharmacy U&C price and the lower local competitor price, but as a rule not below third party payer amounts.  The lower competitor prices were not matched.  Typically, if one cash customer was issued a "True Care" card and received a discount for particular drug, the discount was entered in the pharmacy management software system, and succeeding cash customers for the same drug also were issued a "True Care" card and granted the same reduced price.  The "True Care" discount cards were provided through third party claims administrator PBA Health, under an arrangement where PBA Health charged Rexall Drug pharmacy a nominal $10 monthly fee and, in return, paid Rexall Drug a small fee (e.g., $ .04) on each "True Care" cash customer transaction for the right to sell the Rexall Drug transaction data.  The fee Rexall Drug received on each "True Care" cash transaction was substantially less than, and did not cover, the amount discounted from the U&C price.   Even though "True Care" was not, and is not, a third party payer, it generally appeared as a third party payer in the pharmacy claims processing systems,

22

and the "True Care" cash transactions were accrued under a "True Care" payer category as if they were third party payer transactions.  In particular, the label on the prescription package delivered to the customer and pharmacy management software payer category field identified "True Care" as the payer. The prescription detail in the pharmacy management software however identified the "True Care" transactions as cash sales.

77.     After Med-X Corporation acquired the Moore, OK Rexall Drug pharmacy in November, 2009, the Rexall Drug pharmacy's prior use of the "True Care" card as a vehicle under the limited circumstances described above to provide discounts to cash customers was discontinued almost immediately.  However, in early 2012 USA Drug and its affiliate pharmacies reinstituted the use of the True Care cards and payer category at all of it stores for all match price and other cash transactions.

78. The Moore, OK Rexall Drug pharmacy used the window-based ComputerRX pharmacy management software.  It continued to use the ComputerRX system after its acquisition by Med-X Corporation in November, 2009, the pharmacy's relocation in October, 2011, Walgreen Co.'s acquisition of the USA Drug family of pharmacies in September, 2012, and until its closure in December, 2012.

**C. USA Drug affiliate, Med-X Corporation's, acquisition of the Moore, OK Rexall Drug pharmacy in November, 2009, and the implementation of match price discount program and U&C pricing scheme in January, 2010**

79. Relator has personal knowledge of the operations of the USA Drug family of pharmacies, based on his uninterrupted employment at the Med-X Drug #6142 pharmacy in Moore, OK from the time USA Drug affiliate Med-X Corporation acquired the Moore, OK Rexall Drug pharmacy in November, 2009 through Walgreen Co.'s acquisition of USA Drug and its affiliated pharmacies in September, 2012.  As previously stated, when Med-X Corporation first acquired the Moore, OK

Rexall Drug pharmacy it hired and designated Relator as Pharmacist-in-Charge and for a time continued to publically operate the pharmacy under the Rexall Drug name at the same location, even though the pharmacy was referred to as Med-X Drug #6142 within the USA Drug family of pharmacies. In approximately October, 2011, the pharmacy was relocated from 621 N. Broadway to 601 N. Broadway in Moore, OK and it began to be publically operated under the "Med-X" name.

1. **Reporting of fraudulently inflated U&C prices on GHP prescription drug claims: failure under applicable GHP reimbursement regulations to consider and include cash discount prices in the determination and reporting of U&C price**

80. By January, 2010, shortly following the acquisition of the Moore, OK Rexall Drug pharmacy in November, 2009, a price match discount drug program that had been in effect at USA Drug pharmacy affiliates since before the acquisition was instituted at the Moore, OK Rexall Drug pharmacy.   Pursuant to the USA Drug price match program, the pharmacy matched the prescription drug discount prices offered by its local competitors, and in particular, Walmart. That is, USA Drug did not publish its own proprietary prescription discount formulary which specifically identified and listed the drugs on which it offered every day discount cash prices. Instead, it followed its competitors' formularies, which were available to pharmacy staff in hard copy and on the company intranet system.  Relator estimates that 90% of his pharmacy's price matches were based on the Walmart prescription discount formulary.

81. Typical competitor prescription discount price formularies, including Walmart's, offered $4, 30 day supplies, and $10 or $15, 90 day supplies, for specifically identified drugs.

82. In addition to matching the $4, 30 day supply, and $10 or $15, 90 day supply, prescription discount cash prices of its competitors, Defendants matched the percentage discount cash prices offered by competitors on brand-name drugs and non-formulary generic drugs.

83. Despite a stated policy and pretext that discount prices of competitors were matched only upon the explicit request of the customer, in practice, in the vast majority of instances, competitor discount prices were proactively matched by pharmacy staff without any customer request.

84. In sharp contrast to the every day, match discount prices Defendants offered to cash customers, Defendants knowingly did not extend the same match discount prices to third party payers, including GHPs.  Instead, in express violation of GHP reimbursement methodologies i) that restrict the allowable payment to the lesser of U&C price or one or more alternative APTs and ii) that define U&C price in terms of cash prices or include cash prices in its determination, Defendants knowingly have reported false, materially higher U&C prices which do not take match discount prices into account, on claims submitted to GHPs for the same drugs offered to cash customers at match discount prices.  Defendants knowingly have submitted fraudulently inflated U&C prices for the specific purpose of obtaining from third party payers, including GHPs, materially higher reimbursement payments than they were entitled to receive had they reported true U&C prices in compliance with applicable reimbursement methodologies.  Defendants' conduct has resulted in their illegal receipt of substantial overpayments from GHPs for drugs sold to cash customers at match price discounts.

85. The U&C prices Defendant pharmacies reported to third party payers, including GHPs, were determined by the corporate office in Pine Bluff, AK, and principally by and under the direction of USA Drug Vice President of Pharmacy and Director of Pharmacy Services, Galen Perkins.  With few and infrequent exceptions, one U&C price was established by the corporate office for any particular drug at any given time and that single U&C price was required to be used by all USA Drug affiliated pharmacies at all locations to submit claims to third party payers.

86. As previously mentioned in this subsection, contrary to the great majority of GHP reimbursement methodologies, the U&C prices established by the corporate office for drugs offered to cash customers at match discounts, which all USA Drug affiliated pharmacies were required to report on claims submitted to GHPs, did not reflect or take into account, and were substantially higher than, the match prices.

87. At the time USA Drug acquired the Moore, OK Rexall Drug pharmacy in November 2009, Relator estimates that 80% of the USA Drug pharmacies were using the DOS-based PDX pharmacy management software.  However, by the summer of 2011, all of the USA Drug pharmacies had converted to the ComputerRX system.

88. When a pharmacist or technician at one of the Defendants' pharmacies accessed the pharmacy management software used to transact a prescription fill, the system listed the corporate office mandated U&C price for the drug and the prices paid by the customer on any previous fills. In the case of a drug offered to cash customers at match price and percentage discounts, the prescription fill was routinely processed as follows:

    a. For an uninsured cash customer, the customer paid the match discount price which was materially lower than the corporate-established U&C price reported on third party payer claims, including GHP claims.

    b. For a GHP beneficiary with a co-payment or coinsurance <u>less than</u> the match discount price, the claim was submitted for payment to the GHP; the U&C price the pharmacy reported on the claim was the corporate-established U&C price, not the materially lower match price or a U&C price that included match price transactions in its calculation; the pharmacy received reimbursement from the GHP based on the reported, corporate-established U&C price; and the pharmacy collected any co-payment or co-insurance from the beneficiary.  By means of this fraudulent U&C pricing scheme, whereby Defendants knowingly disregarded match prices in the determination of U&C price in violation of GHP reimbursement regulations and knowingly reported a fraudulently inflated, corporate office substituted U&C price, Defendants knowingly obtained greater reimbursement from GHPs than they were entitled to receive under applicable reimbursement rules.  Typically, the GHP reimbursement, by itself without the co-pay or co-insurance amount, was materially higher than the match discount price defined as cash transaction.

c. For an insured customer, including a GHP beneficiary, with a co-payment or coinsurance <u>more than</u> the match discount price, in many instances Defendants reversed the initial third party payer claim which had been submitted at an inflated U&C price and charged the customer the lower match discount price. However, even in these situations there were occasions where Defendants submitted the claim to the third party payer with a U&C price materially higher than the cash match discount price; collected the co-pay / co-insurance amount from the customer; and received additional reimbursement from the third party payer.

89. In summary, Defendants have knowingly presented false claims for payment, and used false statements and records material to those false claims, on prescription drug claims submitted to GHPs and other third party payers whose reimbursement rules limit payment to the lesser of i) the pharmacy provider's U&C price calculated in accordance with the particular payer's U&C price definition, ii) or one or more APTs. More specifically, Defendants have knowingly disregarded the every-day cash prescription discount match prices they have charged to customers when calculating and reporting U&C prices on claims submitted to GHPs and other third party payers. Instead, they have knowingly reported false, inflated U&C prices in order to receive higher reimbursement. A number of representative examples of Defendants' false claims transactions are set forth below.

90. The USA Drug family of pharmacies Defendants' intent and knowledge regarding the purpose and financial effect of their fraudulent practice of reporting false, inflated U&C prices to third party payers, including GHPs, is capsulized and exposed in a September 7, 2010 e-m sent by USA Drug Vice President of Pharmacy and Director of Pharmacy Services, Galen Perkins, to approximately 138 USA Drug and affiliated pharmacies. It states in part as follows:

> Those pharmacies on Computer RX have previously either priced drugs manually or under the default price of AWP + $5.10. We now have several new price codes and pricing tables in place to address the cash pricing in this system . . .
>
> The brand name is pricing based on the Price Code "J". You will also see this code listed under the drug info. The generic can also be priced off a letter code. In this case the code

is blank because the drug is priced based on a competitive price table. The competitive table number can also be seen in the drug file.

*It is our attempt to give cash pricing to the pharmacy which is comparable to the competition in your area and will also maximizes [sic] the payments from third party payers. The pricing at this time is not intended to replicate any $4 list or similar product. We do not want $4 pricing to be reflected as our Usual and Customary pricing at this time. Our policy of price matching is still in place and it will be necessary on occasion to override the cash pricing in the system. . .*

(Emphasis added).

## 2. Reporting of fraudulently inflated U&C prices on GHP prescription drug claims: Impromptu U&C price adjustment increase scheme

91. Defendants implemented a second, related U&C pricing scheme, which also involved the fraudulent manipulation and reporting of inflated U&C prices. The purpose of this second scheme, like the first scheme, was to maximize reimbursement from GHPs and other third party payers which had reimbursement methodologies limiting payment to the lesser of the pharmacy provider's U&C price or one or more APTs.

92. Beginning in the spring and continuing at least through the fall of 2012, Defendants configured their pharmacy management software to intercept and prevent prescription sales in situations where the adjudicated claim indicated the third party payer, including a GHP, paid the Defendants' reported U&C price. Payment of the reported U&C price signaled that the payer likely would have paid a higher reimbursement rate if a higher U&C price had been reported. In these instances, "* * * * *Warning * * * * * [return] Insurance Paid U&C Price* *" was printed on the initial customer receipt. To complete the sales transaction, the pharmacist or technician reversed the original claim and submitted a new claim with a totally fabricated, decidedly increased U&C price (e.g., double the original amount) intended to capture every available third party payer dollar. The amount of the increased U&C price was arbitrarily set in the discretion of the pharmacist or

technician. Invariably, the reimbursement paid on the adjudicated new claim was higher than the U&C price reported and paid on the original, reversed claim.

93. The scope of this impromptu U&C price adjustment increase scheme included all third party prescription drug claims submitted by Defendants, not just claims for drugs offered to cash customers at match prices.

**D. Continuation of match price discount program at USA Drug and affiliated pharmacies after they were acquired by Walgreen Co. in September, 2012**

94. Relator has personal knowledge of Walgreen Co.'s operation of the USA Drug family of pharmacies after the date it acquired those pharmacies in September, 2012.  His personal knowledge is based on his retention as the Pharmacist-In-Charge at the Med-X Drug #6142 pharmacy in Moore, OK from and after the Walgreens' acquisition and until he was laid off in late October at or near the time the Med-X Drug #6142 pharmacy was closed.

95. On or about September 17, 2012, Walgreens announced the completion of its purchase of the USA Drug family of pharmacies, which included the Med-X #6142 pharmacy in Moore, OK where Relator was the Pharmacist in Charge.

96. Except for perhaps a week period from approximately September 21 to 28, 2012, the USA Drug family of pharmacies acquired and operated by Walgreens continued to match competitor cash discount prices and at the same time knowingly submit false claims to GHPs for the same drugs.  On claims submitted to GHPs with reimbursement regulations which limit payment to the lesser of U&C price and alternative APTs and define U&C price in terms of cash prices or include cash prices in its determination, Defendants knowingly disregarded match prices in the determination of U&C prices and knowingly reported fraudulently inflated U&C prices with the intent and in order to receive higher reimbursement.  As a direct result of Defendants fraudulent conduct, GHPs, in fact, paid Defendants higher reimbursement than Defendants were entitled to

receive or would have received had Defendants reported U&C prices in compliance with applicable "lesser of" GHP reimbursement regulations.

97.  On September 21, 2012, Kathy Collier, DPh, Pharmacy District Manager sent an e-m to USA Drug family of pharmacies acquired by Walgreens which stated that "Effective with the sale to Walgreen's we can no longer match prices, including $4 plan."  The e-m was sent to 19 pharmacies, including pharmacies operated under the Mays, Med-X and USA names.

98. However, approximately one week later, the match price program was reinstituted.  Relator received a call from Pharmacy District Manager, Kathy Collier, and she instructed him to re-implement the prior match price program.  She further informed him that the Defendants did not want to document the reinstitution of the price match program and no written directive would be issued to that effect to the USA Drug family of pharmacies acquired by Walgreen Co.  She stated she was calling each of the pharmacies in her district to notify them of the continuation of the match price program.

99.  The Fall 2012 edition of health and wellness magazine, Remedy's Healthy Living, contained an ad by USA Drug which stated, in relevant part, that "We will match any local competitor's prescription price, including the $4 generic plans! Just ask."  Remedy's Healthy Living magazine, formerly MediZine's Healthy Living, is owned by Medizine, Inc. and is distributed quarterly in doctors' offices and on retail pharmacy counters.  USA Drug affiliated pharmacies identified in the ad included USA Drug, Super D, May's, Med-X ad Drug Warehouse.

100.  As part of the reorganization plan and transition of the USA Drug family of pharmacies after their purchase by Walgreen Co., a select few locations were closed within months of the acquisition, and for those locations and in anticipation of their closure, Walgreen Co. established a "Script Retention Bonus Program," which was facilitated by the continuation of the match price

program. The program was intended to provide an added incentive for current employees of USA Drug and affiliated pharmacies to remain and engage in their best efforts to maintain or improve prescription volume at the pharmacy location, in preparation for the transfer of prescriptions to a nearby Walgreens location. The match price program was critical to maintaining or improving prescription volume for transfer to Walgreens pharmacies.

101. The Med-X Corporation pharmacy in Moore, OK where Relator was the Pharmacist in Charge was closed in or about late October 2012 as part of the reorganization of the USA Drug family of pharmacies after their acquisition by Walgreen Co. Relator's last day at the pharmacy was October 22, 10, 2012.

## E. Representative Examples of Fraudulent Conduct

102. The following paragraphs summarize and compare Defendants' prescription discount cash sale prices to patients and the amounts Defendants submitted on GHP claims for the same drugs during the same time period. The examples clearly illustrate that Defendants did not offer and charge their everyday, U&C price to GHPs as mandated by applicable GHP reimbursement methodologies. The examples below are all derived from transactions involving Med-X store #6142 in Moore, Oklahoma, where Relator worked and eventually became aware of the fraudulent scheme; however, they are representative of the uniform billing practices of all the Defendants' pharmacies. Transactions were recorded in Detail Sales Report spreadsheets identifying the transaction date, unique transaction identification number, sale price, third party payer where applicable, patient copayment amount, and other transaction-level detailed information.

31

## 1. Fluoxetine

### a. 2010

103. On February 16, 2010, Med-X #6142 filled prescription number #1101381 for Fluoxetine 40 mg, 30 count tablets through pharmacist CP and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $166.09.

104. On January 27, 2010, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP overpaid as a result of the fraudulent conduct. The patient should have paid $4 instead of $6, and Medicare should have paid zero instead of $17.35. In other words, the pharmacy charged a Medicare patient a total of $23.35 on a prescription sold to cash customers for $4.

| Store: | Med-X #6142 Moore, OK | Fluoxetine 40mg (30 Count) | |
|---|---|---|---|
| Date: | 01/27/2010 | Patient Co Payment: | $6.00 |
| Prescription # | 1094610 | GHP Billed | MEDICARE D |
| Cash Price: | $4.00 | GHP Payment | $17.35 |
| Reported U&C Price: | $166.09 | GHP Overpayment | $17.35 |

### b. 2011

105. On February 3, 2011, Med-X #6142 filled prescription number #7032763 for Fluoxetine 40 mg, 30 count tablets through pharmacy technician KAC and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $166.09.

106. On February 2, 2011, the government (DHS OK – Oklahoma Medicaid) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, Oklahoma Medicaid should have paid $4 instead of $16.98. The result was a $12.98 overpayment.

| Store: | Med-X #6142 Moore, OK | Fluoxetine 40mg (30 Count) |
|---|---|---|

| Date: | 02/02/2011 | Patient Co Payment: | $0.00 |
|---|---|---|---|
| Prescription # | 7042316 | GHP Billed | DHS OK |
| Cash Price: | $4.00 | GHP Payment | $16.98 |
| Reported U&C Price: | $166.09 | GHP Overpayment | $12.98 |

*c.*   ***2012***

107.  On March 19, 2012, Med-X #6142 filled prescription number #7084002 for Fluoxetine 40 mg, 90 count tablets through pharmacy technician SAL and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $430.91.

108.  On April 4, 2012, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, both the patient and the GHP overpaid.  The patient should have paid $4 instead of $15, resulting in an $11 overpayment by the patient.   TRICARE should have paid zero instead of $23, resulting in a $23 overpayment. Similarly, the $4 cash price should have been reported as Med-X's U&C price instead of the highly inflated $430.91 amount actually reported as the U&C price.  The inflated U&C price served the purpose of shielding Med-X's true U&C price for reimbursement purposes, and allowed the pharmacy to charge a veteran covered by TRICARE a total of $38 for a drug sold to cash customers for $4.

| Store: | Med-X #6142 Moore, OK | **Fluoxetine 40mg (90 Count)** | |
|---|---|---|---|
| Date: | 04/04/2012 | Patient Co Payment: | $15.00 |
| Prescription # | 7075444 | GHP Billed | TRICARE |
| Cash Price: | $4.00 | GHP Payment | $23.00 |
| Reported U&C Price: | $430.91 | GHP Overpayment | $23.00 |

### d.    *2012 post-Walgreen acquisition*

109.  On October 6, 2012, Med-X #6142 filled prescription number #7082501 for Fluoxetine 40 mg, 30 count tablets through pharmacy technician LS and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $153.96.

110.  Similarly, on October 2, 2012, (after Walgreen acquired the Defendants), the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, the GHP should have paid $2 instead of $24.27 after the patient's $2 co-pay covered half of the $4 cash price.  The result was a $22.27 overpayment by Medicare.

| Store: | Med-X #6142 Moore, OK | Fluoxetine 40mg (30 Count) | |
|---|---|---|---|
| Date: | 10/02/2012 | Patient Co Payment: | $2.00 |
| Prescription # | 7082041 | GHP Billed | Medicare D |
| Cash Price: | $4.00 | GHP Payment | $24.27 |
| Reported U&C Price: | $153.96 | GHP Overpayment | $22.27 |

## 2.  Diclofenac 2012

### a.    *Example 1*

111.  On February 20, 2012, Med-X #6142 filled prescription number #7074193 for Diclofenac 75 mg EC, 60 count tablets through pharmacy technician LS and charged the patient a cash purchase price of $8 by cash override as a price match to the Wal-Mart $4 Generics list. The cash matching price technically should have been $4 rather than $8; $8 was entered by mistake by the pharmacy technician. The mistake has no bearing on the analysis below setting forth the fraudulent nature of the transaction. The U&C Price listed in the system for the drug was $71.38.

112.  On February 16, 2012, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below.  TRICARE should have paid $3, the

34

difference between the $8 cash price and the $5 patient co-pay.  TRICARE actually paid $29.27

instead of $3, resulting in a $26.27 overpayment.

| Store: | Med-X #6142 Moore, OK | Diclofenac 75mg EC (60 Count) | |
|--------|------------------------|-------------------------------|--|
| Date: | 02/16/2012 | Patient Co Payment: | $5.00 |
| Prescription # | 7080561 | GHP Billed | TRICARE |
| Cash Price: | $8.00 | GHP Payment | $29.27 |
| Reported     U&C Price: | $71.38 | GHP Overpayment | $26.27 |

**b.    Example 2**

113.  On March 13, 2012, Med-X #6142 filled prescription number #7074193 for Diclofenac

75 mg DR, 60 count tablets through pharmacist CP and charged the patient a cash purchase price

of $8 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in

the system for the drug was $104.33.

114.  On March 30, 2012, the government (DHS OK Oklahoma Medicaid) was billed an

inflated price for the same drug and quantity as illustrated in the table below.  In this example,

Oklahoma Medicaid should have paid the $3 difference between the $8 cash price and the $5

patient co-pay.  Oklahoma Medicaid actually paid $24 instead of $21, resulting in a $21

overpayment.

| Store: | Med-X #6142 Moore, OK | Diclofenac 75mg DR (60 Count) | |
|--------|------------------------|-------------------------------|--|
| Date: | 03/30/2012 | Patient Co Payment: | $5.00 |
| Prescription # | 7085355 | GHP Billed | DHSOK |
| Cash Price: | $8.00 | GHP Payment | $24.00 |
| Reported     U&C Price: | $104.33 | GHP Overpayment | $21.00 |

### 3. Pravastatin

#### a.    2010

115.    On September 11, 2010, Med-X #6142 filled prescription number #7013900 for Pravastatin 20mg, 30 count tablets through pharmacist DM and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $112.01.

116.    On September 10, 2010, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the government were defrauded. The patient should have paid the $4 cash price instead of a $5 co-pay. That $4 would have covered the entire cost of the prescription. The GHP would have paid nothing. Medicare actually paid $11.38, of which all $11.38 constituted an overpayment.

| Store: | Med-X #6142 Moore, OK | Pravastatin 20mg (30 Count) | |
|---|---|---|---|
| Date: | 09/10/10 | Patient Co Payment: | $5.00 |
| Prescription # | 7024191 | GHP Billed | Medicare D |
| Cash Price: | $4 | GHP Payment | $11.38 |
| Reported U&C Price: | $112.01 | GHP Overpayment | $11.38 |

#### b.    2012

117.    On July 24, 2012, Med-X #6142 filled prescription number #7097336 for Pravastatin 40mg, 90 count tablets through pharmacist CP and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $75.49.

118.    Similarly, on July 23, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP again overpaid. The patient should have covered the entire cost of the

prescription by paying the $10 cash price instead of paying a $12 co-pay.  Medicare should have

paid nothing, but instead was billed and paid $5.94.

| Store: | Med-X #6142 Moore, OK | Pravastatin 40mg (90 Count) | |
|---|---|---|---|
| Date: | 07/23/12 | Patient Co Payment: | $12.00 |
| Prescription # | 7068132 | GHP Billed | Medicare D |
| Cash Price: | $10 | GHP Payment | $5.94 |
| Reported U&C Price: | $75.49 | GHP Overpayment | $5.94 |

### c.     2012 post-Walgreen acquisition

119.  On October 5, 2012, Med-X #6142 filled prescription number #7104899 for Pravastatin

20mg, 30 count tablets through pharmacist KAC and charged the patient a cash purchase price of

$4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the

system for the drug was $96.33.

120.  On October 9, 2012, the government (Medicare Part D) was billed an inflated price for

the same drug and quantity as illustrated in the table below.  In this example, Medicare should

have paid the $4 cash price instead of $11.20.  Thus, the GHP overpaid by $7.20.

| Store: | Med-X #6142 Moore, OK | Pravastatin 20mg (30 Count) | |
|---|---|---|---|
| Date: | 10/09/12 | Patient Co Payment: | $0 |
| Prescription # | 7087308 | GHP Billed | Medicare D |
| Cash Price: | $4 | GHP Payment | $11.20 |
| Reported U&C Price: | $96.33 | GHP Overpayment | $7.20 |

## 4.  Warfarin

### a.     2010

121.  On January 21, 2010, Med-X #6142 filled prescription number #1084516 for Warfarin

Sodium 7.5mg, 30 count tablets through pharmacist AH and charged the patient a cash purchase

price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price

listed in the system for the drug was $34.03.

122. On January 16, 2010, the government (Medicare Part D) was billed an inflated price for

the same drug and quantity as illustrated in the table below. In this example, Medicare should

have paid the $1.50 difference between the $4 cash price and the $2.50 patient co-pay. Medicare

actually paid $9.84, resulting in an $8.34 overpayment.

| Store: | Med-X #6142 Moore, OK | **Warfarin Sod 7.5mg (30 Count)** | |
|---|---|---|---|
| Date: | 01/16/10 | Patient Co Payment: | $2.50 |
| Prescription # | 7004634 | GHP Billed | Medicare D Prime |
| Cash Price: | $4 | GHP Payment | $9.84 |
| Reported U&C Price: | $34.03 | GHP Overpayment | $8.34 |

*b.    2012*

123. On February 18, 2012, Med-X #6142 filled prescription number #7055991 for Warfarin

Sodium 7.5mg, 90 count tablets through pharmacy technician SI and charged the patient a cash

purchase price of $12 by cash override as a price match to the Wal-Mart $4 Generics list. The

U&C Price listed in the system for the drug was $83.69. The matching cash price technically

should have been $10 rather than $12; the mistake by the pharmacy technician has bearing on the

analysis of fraudulent conduct below.

124. On February 16, 2012, the government (Medicare Part D) was billed an inflated price for

the same drug and quantity as illustrated in the table below. In this example, both the patient and

the GHP were defrauded. The patient should have paid the $12 cash price instead of a $30 co-pay,

resulting in an $18 overpayment by the patient. Medicare should have paid nothing, making the

full $20.86 spent an overpayment.

| Store: | Med-X #6142 Moore, OK | **Warfarin Sod 7.5mg (90 Count)** | |
|---|---|---|---|

| Date: | 02/16/12 | Patient Co Payment: | $30.00 |
|---|---|---|---|
| Prescription # | 7080466 | GHP Billed | Medicare D Prime |
| Cash Price: | $12 | GHP Payment | $20.86 |
| Reported U&C Price: | $83.69 | GHP Overpayment | $20.86 |

### c. *2012 Walgreen Ownership Example*

125. On September 11, 2012, Med-X #6142 filled prescription number #7102339 for Warfarin 2mg, 30 count tablets through pharmacist CC and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $26.92.

126. On September 14, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP again overpaid. The patient should have paid the $4 cash price instead of a $5 co-pay. TRICARE should have paid nothing, making the $1.26 an overpayment.

| Store: | Med-X #6142 Moore, OK | **Warfarin 2mg (30 Count)** | |
|---|---|---|---|
| Date: | 09/14/12 | Patient Co Payment: | $5.00 |
| Prescription # | 7102787 | GHP Billed | Tricare |
| Cash Price: | $4 | GHP Payment | $1.26 |
| Reported U&C Price: | $26.92 | GHP Overpayment | $1.26 |

### 5. Lovastatin

### a. *2010*

127. On June 16, 2010, Med-X #6142 filled prescription number #1102558 for Lovastatin 20mg, 30 count tablets through pharmacy technician DC and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $85.18.

128. Similarly, on June 14, 2010, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, the GHP

should have paid the $1.50 difference between the $4 cash price and the $2.50 patient co-pay. The

GHP actually paid $6.68, resulting in a $5.18 overpayment.

| Store: | Med-X #6142 Moore, OK | Lovastatin 20mg (30 Count) | |
|---|---|---|---|
| Date: | 06/14/10 | Patient Co Payment: | $2.50 |
| Prescription # | 7019989 | GHP Billed | Secure D |
| Cash Price: | $4 | GHP Payment | $6.68 |
| Reported U&C Price: | $85.18 | GHP Overpayment | $5.18 |

*b.*   *2011*

129.  On June 13, 2011, Med-X #6142 filled prescription number #7031753 for Lovastatin

40mg, 30 count tablets through pharmacist CP and charged the patient a cash purchase price of $4

by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the

system for the drug was $142.15.

130.  On June 8, 2011, the government (Medicare Part D) was billed an inflated price for the

same drug and quantity as illustrated in the table below.  In this example, both the patient and the

GHP overpaid.  The patient should have paid the $4 cash price instead of a $5 co-pay, and the

GHP should have paid nothing instead of a $4 overpayment.  Med-X essentially double-charged

the patient and the GHP on this transaction.

| Store: | Med-X #6142 Moore, OK | Lovastatin 40mg (30 Count) | |
|---|---|---|---|
| Date: | 06/8/11 | Patient Co Payment: | $5.00 |
| Prescription # | 7023068 | GHP Billed | Secure D |
| Cash Price: | $4 | GHP Payment | $4.00 |
| Reported U&C Price: | $142.15 | GHP Overpayment | $4.00 |

*c.*   *2012*

131.  On June 20, 2012, Med-X #6142 filled prescription number #7064541 for Lovastatin

40mg, 30 count tablets through pharmacy technician SAL and charged the patient a cash purchase

price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $124.35.

132. On June 25, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, Medicare should have paid the $4 cash price instead of $12.49. The result was an $8.49 overpayment.

| Store: | Med-X #6142 Moore, OK | Lovastatin 40mg (90 Count) | |
|---|---|---|---|
| Date: | 06/25/12 | Patient Co Payment: | $0 |
| Prescription # | 7089297 | GHP Billed | Medicare D |
| Cash Price: | $4 | GHP Payment | $12.49 |
| Reported U&C Price: | $124.35 | GHP Overpayment | $8.49 |

### d. 2012 post-Walgreen acquisition

133. On September 19, 2012, Med-X #6142 filled prescription number #7103173 for Lovastatin 40mg, 90 count tablets through pharmacist KA and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $41.38.

134. On September 24, 2012 the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP overpaid. The patient should have paid the $10 cash price instead of an $18 co-pay, resulting in an $8 overpayment by the patient. Medicare should have paid nothing, making all $8.04 expended an overpayment.

| Store: | Med-X #6142 Moore, OK | Lovastatin 40mg (90 Count) | |
|---|---|---|---|
| Date: | 09/24/12 | Patient Co Payment: | $18 |
| Prescription # | 7094733 | GHP Billed | Medicare D |
| Cash Price: | $10 | GHP Payment | $8.04 |
| Reported U&C Price: | $41.98 | GHP Overpayment | $8.04 |

### 6. Lisinopril

#### a.    2010

135.   On March 15, 2010, Med-X #6142 filled prescription number #7007470 for Lisinopril 10mg, 30 count tablets through pharmacist CP and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $33.47.

136.   On March 18, 2010, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, TRICARE should have paid the $1 difference between the $4 cash price and the $3 patient co-pay.  TRICARE actually paid $4.50 instead of $1, resulting in a $3.50 overpayment.

| Store: | Med-X #6142 Moore, OK | Lisinopril 10mg (30 Count) | |
|---|---|---|---|
| Date: | 03/18/10 | Patient Co Payment: | $3 |
| Prescription # | 7005365 | GHP Billed | Tricare |
| Cash Price: | $4 | GHP Payment | $4.50 |
| Reported U&C Price: | $33.47 | GHP Overpayment | $3.50 |

#### b.    2011

137.   On May 5, 2011, Med-X #6142 filled prescription number #7051851 for Lisinopril 20mg, 90 count tablets through pharmacy technician LS and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $102.22.

138.   On May 5, 2011, the government (Medicare Part D by Secure D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, the GHP should have paid the $2.90 difference between the $4 cash price and the $1.10 patient co-pay.  The GHP actually paid $10.30 instead of $2.90, resulting in a $7.40 overpayment.

| Store: | Med-X #6142 Moore, OK | Lisinopril 20mg (90 Count) | |
|---|---|---|---|
| Date: | 05/05/11 | Patient Co Payment: | $1.10 |
| Prescription # | 7051886 | GHP Billed | Secure D |
| Cash Price: | $4 | GHP Payment | $10.30 |
| Reported U&C Price: | $102.22 | GHP Overpayment | $7.40 |

### c.   *2012 post-Walgreen acquisition*

139.   On September 17, 2012, Med-X #6142 filled prescription number #7073665 for Lisinopril 20mg, 90 count tablets through pharmacist SAL and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $20.09.

140.   On September 18, 2012, (after the date Walgreen acquired the Defendants), the government (Medicare Part D by Secure D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, both the patient and the GHP overpaid. The patient should have paid the $10 cash price instead of a $12.50 co-pay, resulting in a $2.50 overpayment by the patient.  The GHP should have paid nothing, making the full $3.98 expended an overpayment.

| Store: | Med-X #6142 Moore, OK | Lisinopril 20mg (90 Count) | |
|---|---|---|---|
| Date: | 09/18/12 | Patient Co Payment: | $12.50 |
| Prescription # | 7103099 | GHP Billed | Medicare D |
| Cash Price: | $10 | GHP Payment | $3.98 |
| Reported U&C Price: | $20.09 | GHP Overpayment | $3.98 |

## 7.  Levothyroxine

### a.   *2010*

141.   On May 24, 2010, Med-X #6142 filled prescription number #7013190 for Levothyroxine 75 mcg, 30 count tablets through pharmacist AH and charged the patient a cash purchase price of

$4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $14.93.

142. Similarly, on June 2, 2010, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, the GHP should have paid the $1.50 difference between the $4 cash price and the $2.50 patient co-pay. The GHP actually paid $8.41 instead of $1.50, resulting in a $6.91 overpayment.

| Store: | Med-X #6142 Moore, OK | Levothyroxine 75mcg (30 count) | |
|--------|-----------------------|-------------------------------|---|
| Date: | 06/02/2010 | Patient Co Payment: | $2.50 |
| Prescription # | 7013892 | GHP Billed | Medicare |
| Cash Price: | $4.00 | GHP Payment | $8.41 |
| Reported U&C Price: | $14.93 | GHP Overpayment | $6.91 |

### b.    2011

143. On November 8, 2011, Med-X #6142 filled prescription number #7040145 for Levothyroxine 75 mcg, 30 count tablets through pharmacist CP and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $17.88.

144. Also on November 8, 2011, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below. The GHP should have paid the $0.93 difference between the $4 cash price and the $3.07 patient co-pay. The GHP actually paid $3.67 instead of $0.93, resulting in a $2.74 overpayment.

| Store: | Med-X #6142 Moore, OK | Levothyroxine 75mcg (30 count) | |
|--------|-----------------------|-------------------------------|---|
| Date: | 11/08/2011 | Patient Co Payment: | $3.07 |
| Prescription # | 7069642 | GHP Billed | TRICARE |
| Cash Price: | $4.00 | GHP Payment | $3.67 |
| Reported U&C Price: | $17.88 | GHP Overpayment | $2.74 |

c.    *2012*

145.  On September 10, 2012, Med-X #6142 filled prescription number #7094558 for Levothyroxine 75 mcg, 30 count tablets through pharmacist KA and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $15.19.

146.  Also on September 10, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, both the patient and the GHP overpaid.  The patient should have paid the $4 cash price instead of a $6 co-pay and covered the entire cost of the prescription.  The patient actually overpaid by $2, and the GHP in turn overpaid by the full $1.10 expended.

| Store: | Med-X #6142 Moore, OK | Levothyroxine 75mcg (30 count) | |
|---|---|---|---|
| Date: | 09/10/2012 | Patient Co Payment: | $6.00 |
| Prescription # | 7096287 | GHP Billed | Medicare (Secure D) |
| Cash Price: | $4.00 | GHP Payment | $1.10 |
| Reported U&C Price: | $15.19 | GHP Overpayment | $1.10 |

d.    *2012 Walgreen Ownership Example*

147.  On October 8, 2012, Med-X #6142 filled prescription number #7094558 for Levothyroxine 75 mcg, 30 count tablets through pharmacy technician ZW and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $16.88.

148.  On October 16, 2012, (after the date Walgreens had acquired Defendants), the government (Medicare Part D by Secure D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, the GHP should have paid the $2.90

difference between the $4 cash price and the $1.10 patient co-pay.  The GHP actually paid $6 instead of $2.90, resulting in a $3.10 overpayment.

| Store: | Med-X #6142 Moore, OK | Levothyroxine 75mcg (30 count) | |
|---|---|---|---|
| Date: | 10/16/2012 | Patient Co Payment: | $1.10 |
| Prescription # | 7076314 | GHP Billed | Medicare   (Secure D) |
| Cash Price: | $4.00 | GHP Payment | $6.00 |
| Reported U&C Price: | $16.88 | GHP Overpayment | $3.10 |

**8.  Cyclobenzaprine**

*a.    2010*

149.   On February 3, 2012, Med-X #6142 filled prescription number #7003093 for Cyclobenzaprine 10 mg, 90 count tablets through pharmacy technician DF and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $105.37.

150.   On February 8, 2010, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below.  The GHP should have paid the $7 difference between the $10 cash price and the $3 patient co-pay.  The GHP actually paid $16.86 instead of $7, resulting in a $9.86 overpayment.

| Store: | Med-X #6142 Moore, OK | Cyclobenzaprine 10mg (90 Count) | |
|---|---|---|---|
| Date: | 02/08/2010 | Patient Co Payment: | $3.00 |
| Prescription # | 1102265 | GHP Billed | TRICARE |
| Cash Price: | $10.00 | GHP Payment | $16.86 |
| Reported U&C Price: | $105.37 | GHP Overpayment | $9.86 |

*b.    2011*

151.   On July 1, 2011, Med-X #6142 filled prescription number #7057198 for Cyclobenzaprine 5 mg, 30 count tablets through pharmacy technician KAC and charged the patient a cash purchase

46

price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $55.22.

152. On July 8, 2011, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP overpaid. The patient should have been able to cover the full cost of the prescription by paying the $4 cash price. The patient was instead charged a $5.45 co-pay, resulting in a $1.45 overpayment by the patient. The GHP overpaid by $1.50 instead of paying nothing.

| Store: | Med-X #6142 Moore, OK | Cyclobenzaprine 5mg (30 Count) | |
|---|---|---|---|
| Date: | 07/08/2011 | Patient Co Payment: | $5.45 |
| Prescription # | 7057808 | GHP Billed | MEDICARE D |
| Cash Price: | $4 | GHP Payment | $1.50 |
| Reported U&C Price: | $55.22 | GHP Overpayment | $1.50 |

*c.*   ***2012***

153. On September 6, 2012, Med-X #6142 filled prescription number #7101926 for Cyclobenzaprine 10 mg, 90 count tablets through pharmacist CP and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $30.98.

154. Also on September 6, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. The GHP should have paid the $5 difference between the $10 cash price and the $5 patient co-pay. The GHP actually paid $9.27 instead of $5, resulting in a $4.27 overpayment.

| Store: | Med-X #6142 Moore, OK | Cyclobenzaprine 10mg (90 Count) | |
|---|---|---|---|
| Date: | 09/06/2012 | Patient Co Payment: | $5.00 |
| Prescription # | 7101876 | GHP Billed | TRICARE |
| Cash Price: | $10 | GHP Payment | $9.27 |
| Reported U&C Price: | $30.98 | GHP Overpayment | $4.27 |

### d.    *2012 post-Walgreen acquisition*

155.    On October 3, 2012, Med-X #6142 filled prescription number #7104669 for Cyclobenzaprine 10 mg, 90 count tablets through pharmacist CP and charged the patient a cash purchase price of $10.09 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $30.98.  Note that the $10.09 price match is a result of a typographical error; the price match should have been $10 instead of $10.09.  The extra nine cents has no bearing on the following analysis of fraudulent conduct.

156.  On October 4, 2012, after Walgreen's acquisition of the Defendants, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, the GHP should have paid the $5.09 difference between the $10.09 cash price and the $5 patient co-pay.   The GHP actually paid $9.27 instead of $5.09, resulting in a $4.18 overpayment.

| Store: | Med-X #6142 Moore, OK | Cyclobenzaprine 10mg (90 Count) | |
|---|---|---|---|
| Date: | 10/04/2012 | Patient Co Payment: | $5.00 |
| Prescription # | 7104792 | GHP Billed | TRICARE |
| Cash Price: | $10.09 | GHP Payment | $9.27 |
| Reported U&C Price: | $30.98 | GHP Overpayment | $4.18 |

### 9.  Finasteride - 2012

157.  On June 21, 2012, Med-X #6142, Moore, OK filled prescription number #7093974 for Finasteride 5 mg, 90 count tablets through pharmacy technician SAL and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $264.83.

158.  On May 28, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, Medicare Part D should

have been charged the $4 difference between the $10 cash price and the $6 patient copay.

Medicare Part D actually paid $82.78, resulting in a $78.78 overpayment.

| Store: | Med-X #6142 Moore, OK | Finasteride 5mg (90 Count) | |
|---|---|---|---|
| Date: | 05/28/12 | Patient Co Payment: | $6 |
| Prescription # | 7061663 | GHP Billed | Medicare Part D |
| Cash Price: | $10 | GHP Payment | $82.78 |
| Reported U&C Price: | $264.83 | GHP Overpayment | $78.78 |

## 10. Isosorbide Mononitrate - 2011

159.  On November 15, 2011, Med-X #6142, Moore, OK filled prescription number #7070388

for Isosorbide Mononitrate 30 mg, 90 count tablets through pharmacy technician AH and charged

the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4

Generics list. The U&C Price listed in the system for the drug was $99.46.

160.  On November 8, 2011, the government (Medicare Part through Secure D) was billed an

inflated price for the same drug and quantity as illustrated in the table below.  In this example,

Secure D should have been charged the $7.50 difference between the $10 cash price and the $2.50

patient copay.  Secure D actually paid $31.01, resulting in a $23.51 overpayment.

| Store: | Med-X #6142 Moore, OK | Isosorbide Mononitrate 30mg (90 Count) | |
|---|---|---|---|
| Date: | 11/15/11 | Patient Co Payment: | $2.50 |
| Prescription # | 7069653 | GHP Billed | Secure D |
| Cash Price: | $10 | GHP Payment | $31.01 |
| Reported U&C Price: | $99.46 | GHP Overpayment | $23.51 |

## 11. Paroxetine - 2012

161.  On March 9, 2011, Med-X #6142, Moore, OK filled prescription number #7037161 for

Paroxetine 20mg, 90 count tablets through pharmacy technician KAC and charged the patient a

cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The

U&C Price listed in the system for the drug was $243.87.

162. On February 22, 2011, the government (Medicare Part D through Secure Horizon Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, both the patient and the GHP overpaid. Secure Horizon Part D should have paid nothing after the patient copay, and the patient should have paid $10 instead of a $21 copay. Secure Horizon Part D actually paid $27.39, resulting in a $27.39 overpayment.

| Store: | Med-X #6142 Moore, OK | Paroxetine 20mg (90 Count) | |
|---|---|---|---|
| Date: | 02/22/2011 | Patient Co Payment: | $21 |
| Prescription # | 7044574 | GHP Billed | Secure Horizon Part D |
| Cash Price: | $10 | GHP Payment | $27.39 |
| Reported U&C Price: | $243.87 | GHP Overpayment | $27.39 |

## F. High Volume, Low Spread Representative Examples

163. The remaining two representative example sets are included to point out that there are a number of transactions involving relatively low individual overpayment amounts on high utilization, high volume drugs. While any one discrete transaction may involve a de minimus overpayment amount, these prescriptions are filled regularly and often. Hundreds or thousands of small transactions combine to form significant damages when considered in the aggregate.

## 1. Metoprolol Tartrate

### a. 2010

164. On July 29, 2010, Med-X #6142, Moore, OK filled prescription number #7019032 for Metoprol Tar 25mg, 60 count tablets through pharmacist AH and charged the patient a cash purchase price of $8 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $20.55.

165. On August 7, 2010, the government (DHS OK – Oklahoma Medicaid) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example,

Oklahoma Medicaid should have been offered the $8 cash price. The GHP actually paid $8.34, resulting in a $0.34 overpayment.

| Store: | Med-X #6142 Moore, OK | **Metoprol Tar 25mg (60 Count)** | |
|---|---|---|---|
| Date: | 08/07/2010 | Patient Co Payment: | $0.00 |
| Prescription # | 7021984 | GHP Billed | DHS OK |
| Cash Price: | $8.00 | GHP Payment | $8.34 |
| Reported   U&C Price: | $20.55 | GHP Overpayment | $0.34 |

### b.   2011

166. On January 31, 2011, Med-X #6142 filled prescription number #7035030 for Metoprol Tar 25mg, 60 count tablets through pharmacist CP and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $20.55.

167. On February 7, 2011, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, the GHP should have been charged the $1.50 difference between the $4 cash price and the $2.50 patient co-pay. The GHP actually paid $3.04 instead of $1.50, resulting in a $1.54 overpayment.

| Store: | Med-X #6142 Moore, OK | **Metoprol Tar 25mg (60 Count)** | |
|---|---|---|---|
| Date: | 02/07/2011 | Patient Co Payment: | $2.50 |
| Prescription # | 7042960 | GHP Billed | Medicare (Secure D) |
| Cash Price: | $4.00 | GHP Payment | $3.04 |
| Reported   U&C Price: | $20.55 | GHP Overpayment | $1.54 |

### c.   2012

168. On September 2, 2012, Med-X #6142 filled prescription number #7097730 for Metoprol Tar 25mg, 60 count tablets through pharmacist SI and charged the patient a cash purchase price of

$4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $25.16.

169. On September 5, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, the GHP should have been charged the $2 difference between the $4 cash price and the $2 patient co-pay. The GHP actually paid $3.10 instead of $2, resulting in a $1.10 overpayment

| Store: | Med-X #6142 Moore, OK | **Metoprol Tar 25mg (60 Count)** | |
| --- | --- | --- | --- |
| Date: | 09/05/2012 | Patient Co Payment: | $2.00 |
| Prescription # | 7095809 | GHP Billed | MEDICARE D |
| Cash Price: | $4.00 | GHP Payment | $3.10 |
| Reported U&C Price: | $25.16 | GHP Overpayment | $1.10 |

### d.   *2012 post-Walgreen acquisition*

170. On September 27, 2012, after Walgreen's acquisition of the Defendants, Med-X #6142 filled prescription number #7097730 for Metoprol Tar 25mg, 60 count tablets through pharmacy technician KAC and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4.05 Generics list. The U&C Price listed in the system for the drug was $25.16.

171. On September 6, 2012, the government (Medicare Part D) was billed an inflated price for the same drug and quantity as illustrated in the table below. In this example, the GHP should have been charged the $1.05 difference between the $4.05 cash price and the $3 patient co-pay. The GHP actually paid $1.50, resulting in a $0.45 overpayment.

| Store: | Med-X #6142 Moore, OK | **Metoprol Tar 25mg (60 Count)** | |
| --- | --- | --- | --- |
| Date: | 10/09/2012 | Patient Co Payment: | $3.00 |
| Prescription # | 7096792 | GHP Billed | Medicare (Secure D) |
| Cash Price: | $4.05 | GHP Payment | $1.50 |
| Reported U&C Price: | $25.16 | GHP Overpayment | $0.45 |

**2. Atenolol**

*a.    2010*

172. On March 17, 2010, Med-X #6142 filled prescription number #7002064 for Atenolol 50 mg, 100 count tablets through pharmacy technician KAC and charged the patient a cash purchase price of $10 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $96.64.

173. On March 16, 2010, the government (through Medicare D) was billed an inflated price for the same drug as illustrated by the chart below. In this example, the GHP should have paid nothing because the patient's $10 co-pay should have covered the full cost of the prescription. The GHP actually paid $0.34, resulting in a $0.34 overpayment.

| Store: | Med-X #6142 Moore, OK | Atenolol 50 mg (100 Count) | |
|---|---|---|---|
| Date: | 03/16/2010 | Patient Co Payment: | $10.00 |
| Prescription # | 7011024 | GHP Billed | Medicare D |
| Cash Price: | $10.00 | GHP Payment | $0.34 |
| Reported    U&C Price: | $96.64 | GHP Overpayment | $0.34 |

*b.    2011*

174. On May 7, 2011, Med-X #6142 filled prescription number #7051912 for Atenolol 50 mg, 180 count tablets through pharmacist JT and charged the patient a cash purchase price of $20 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $168.37.

175. On June 18, 2011, the government (through TRICARE) was billed an inflated price on the same drug as illustrated by the chart below. In this example, the GHP should have paid the $11 difference between the $20 actual cash price and the $9 patient co-pay. The GHP actually paid $16.10 instead of $11, resulting in a $5.10 overpayment.

| Store: | Med-X #6142 Moore, OK | Atenolol 50 mg (180 Count) | |
|---|---|---|---|
| Date: | 06/18/2011 | Patient Co Payment: | $9.00 |
| Prescription # | 7034800 | GHP Billed | TRICARE |
| Cash Price: | $20.00 | GHP Payment | $16.10 |
| Reported    U&C Price: | $168.37 | GHP Overpayment | $5.10 |

*c.    2012*

176. On August 27, 2012, Med-X #6142, Moore, OK filled prescription number #7100827 for Atenolol 25 mg, 30 count tablets through pharmacy technician LS and charged the patient a cash purchase price of $4 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $9.98.

177. On September 6, 2012, the government (Medicaid of Oklahoma though DHS OK) was billed an inflated price for the same drug and quantity as illustrated in the table below.  In this example, Oklahoma Medicaid should have been charged the $4 cash price.  Oklahoma Medicaid actually paid $5.52, resulting in a $1.52 overpayment.

| Store: | Med-X #6142 Moore, OK | Atenolol 50 mg (30 Count) | |
|---|---|---|---|
| Date: | 09/06/2012 | Patient Co Payment: | $0.00 |
| Prescription # | 7081356 | GHP Billed | DHS OK |
| Cash Price: | $4.00 | GHP Payment | $5.52 |
| Reported    U&C Price: | $9.88 | GHP Overpayment | $1.52 |

*d.    2012 post-Walgreen acquisition*

178. On October 4, 2012, Med-X #6142 filled prescription number #7087864 for Atenolol 25 mg, 180 count tablets through pharmacist AH and charged the patient a cash purchase price of $20 by cash override as a price match to the Wal-Mart $4 Generics list. The U&C Price listed in the system for the drug was $36.98.

179. Also on October 4, 2012, after Walgreen acquired the Defendants, the government (TRICARE) was billed an inflated price for the same drug and quantity as illustrated in the table

below.  In this example, the GHP should have been charged the $5 difference between the $20

cash price and the $15 patient co-pay.  The GHP actually paid $14.20 instead of $5, resulting in a

$9.20 overpayment.

| Store: | Med-X #6142 Moore, OK | Atenolol 50 mg (180 Count) | |
|---|---|---|---|
| Date: | 10/04/2012 | Patient Co Payment: | $15.00 |
| Prescription # | 7066389 | GHP Billed | TRICARE |
| Cash Price: | $20.00 | GHP Payment | $14.20 |
| Reported U&C Price: | $36.98 | GHP Overpayment | $9.20 |

## G. Non-Formulary Percentage Discount Representative Examples

180.  As stated above, in addition to manipulating reported U&C prices in transactions

involving prices matched to the WalMart $4 generics list detailed above, USA Drug reported

falsely inflated U&C prices on claims presented for non-formulary generics and, in some instances,

brand drugs.  Non-formulary generic and brand drugs were sold at lower percentage discount cash

prices to uninsured customers, while high U&C prices designed to maximize reimbursement were

reported to GHPs and other third-party payors.   The following representative examples illustrate

this practice.  None involve drugs on the WalMart $4 generic formulary, and several involve brand

drugs.

## 1.  2010 Examples

### a.     Pantoprazole

181.  On September 7, 2010, Med-X #6142, Moore, OK filled prescription number #7004119

for Pantoprazole 40mg, 30-count tablets through pharmacist CP and charged the patient a cash

purchase price of $78.67 by cash override.  The U&C Price reported to third parties varied.  One

reported U&C was $136.74, as demonstrated by prescription number #7027794 filled September

10, 2010 and billed to GHP TriCare.  Based on USA Drug's reported fraudulent, inflated U&C

price, under the Tricare reimbursement methodology the patient copay was $22.00 and Tricare

paid $68.47. The GHP damages calculation for the September 10 transaction is as follows: [$68.47 TriCare payment – $56.67 government amount payable (determined by $78.67 cash price - $22 copay) = $11.80 GHP Overpayment amount].   The government overpaid by $11.80 on this prescription based on the falsely inflated U&C price reported by USA Drug.

| Store: | Med-X #6142 Moore, OK | **Pantoprazole 40mg 30 count** | |
|---|---|---|---|
| Date: | 09/07/10 | Patient Co Payments: | $22.00 |
| Prescription # | 7004119 | GHP Billed | DHS |
| Cash Price: | $78.67 | GHP Payments | $68.47 |
| Reported U&C Price: | $136.74 | GHP Overpayments | $11.80 |

### b.   *Propranolol*

182.   On August 27, 2010, Med-X #6142, Moore, OK filled prescription number #1097273 for Propranolol 80 mg, 90-count tablets through pharmacy tech DF and charged the patient a cash purchase price of $25.46 by cash override. The U&C Price reported to third parties was $159.54, as demonstrated by prescription number #7006973 filled August 4, 2010 and billed to GHP CCRX, a Part D plan.  Based on USA Drug's reported fraudulent, inflated U&C price, under the CCRX reimbursement methodology the patient copay was $1.10 and CCRX paid $103.06. The GHP damages calculation is as follows: [$103.06 CCRX payment – $24.36 true government amount payable ($25.46 cash price - $1.10 copay) = $78.70 GHP Overpayment amount]. The GHP overpaid by $78.70 on this prescription based on the falsely inflated U&C price reported by USA Drug, instead of paying $24.36 after the patient's $1.10 copay was applied to a $25.46 cash price.

| Store: | Med-X #6142 Moore, OK | **Propranolol ER 80 mg 90 count** | |
|---|---|---|---|
| Date: | 08/04/10 | Patient Co Payment: | $1.10 |
| Prescription # | 1097273 | GHP Billed | CCRX |
| Cash Price: | $25.46 | GHP Payment | $103.06 |
| Reported U&C Price: | $159.54 | GHP Overpayment | $78.70 |

### c.   *Cefdinir*

183.   On July 9, 2010, Med-X #6142, Moore, OK filled prescription number #7022255 for Cefdinir 250/5ml, 60-count through pharmacy tech RL and charged the patient a cash purchase price of $25.79 by cash override. The U&C Price reported to third parties was $113.35, as demonstrated by prescription number #7023682 filled July 26, 2010 and billed to GHP OK DHS (OK Medicaid). Based on USA Drug's reported fraudulent, inflated U&C price, under the OK DHS reimbursement methodology the patient copay was $ and OK DHS paid $42.89. The GHP damages calculation is as follows: [$42.89 OK DHS payment – $25.79 cash price = $17.10 GHP Overpayment amount]. The GHP overpaid by $17.10 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $42.89 instead of the $25.79 cash price offered to customers without insurance or benefit.

| Store: | Med-X #6142 Moore, OK | Cefdinir Sus 250/5ml 60 count | |
|---|---|---|---|
| Date: | 07/09/10 | Patient Co Payment: | $0.00 |
| Prescription #: | 7022255 | GHP Billed | OK DHS |
| Cash Price: | $25.79 | GHP Payment | $42.89 |
| Reported U&C Price: | $113.35 | GHP Overpayment | $17.10 |

## 2.   2011 Examples

### a.   *Zolpidem*

184.   On August 12, 2011, Med-X #6142, Moore, OK filled prescription number #4020090 for Zolpidem Tart ER 12.5mg, 30-count tablets through pharmacy tech KAC and charged the patient a cash purchase price of $104.80 by cash override. The U&C Price reported to third parties was $189.49, as demonstrated by prescription number #4019728 filled August 2, 2011 and billed to GHP Oklahoma DHS. Based on USA Drug's reported fraudulent, inflated U&C price, under the OK DHS reimbursement methodology the patient copay was zero and OK DHS paid

$119.02.The GHP damages calculation is as follows: [$119.02 DHS payment - $104.80 cash price = $14.22 GHP Overpayment amount]. The government overpaid by $14.22 on this prescription based on the falsely inflated U&C price reported by USA Drug.

| Store: | Med-X #6142 Moore, OK | Zolpidem Tart ER 12.5mg 30 count | |
|---|---|---|---|
| Date: | 8/12/11 | Patient Co Payment: | $0 |
| Prescription # | 4020090 | GHP Billed | DHS |
| Cash Price: | $104.80 | GHP Payment | $119.02 |
| Reported U&C Price: | $189.49 | GHP Overpayment | $14.22 |

### b.   *Tizanidine*

185.   On April 4, 2011, Med-X #6142, Moore, OK filled prescription number #7018911 for Tizanidine 4mg, 60-count tablets through pharmacy tech DF and charged the patient a cash purchase price of $10 by cash override. The U&C Price reported to third parties was $101.91, as demonstrated by prescription number #7038797 filled April 12, 2011 and billed to GHP Humana Part D. Based on USA Drug's reported fraudulent, inflated U&C price, under the Humana Part D reimbursement methodology the patient copay was $7 and Humana Part D paid $15.3. The GHP damages calculation is as follows: [$15.03 DHS payment – $3.00 ($10 cash price - $7 copay) = $12.03 GHP Overpayment amount]. The GHP overpaid by $12.03 on this prescription based on the falsely inflated U&C price reported by USA Drug, instead of paying $3 after the patient's $7 copay was applied to a $10 cash price.

| Store: | Med-X #6142 Moore, OK | Tizanidine 4mg 60 count | |
|---|---|---|---|
| Date: | 4/4/11 | Patient Co Payment: | $7.00 |
| Prescription # | 7018911 | GHP Billed | Humana D |
| Cash Price: | $10 | GHP Payment | $15.03 |
| Reported U&C Price: | $101.91 | GHP Overpayment | $12.03 |

### c.   *Tamsulosin*

186. On August 26, 2011, Med-X #6142, Moore, OK filled prescription number #7062250 for Tamsulosin 0.4mg, 30-count tablets through pharmacy tech KAC and charged the patient a cash purchase price of $27.95 by cash override. The U&C Price reported to third parties was $140.55, as demonstrated by prescription number #7052668 filled August 15, 2011 and billed to GHP Medprime, a Part D plan. Based on USA Drug's reported fraudulent, inflated U&C price, under the Medprime reimbursement methodology the patient copay was $30 and Medprime paid $ 76.30. The GHP damages calculation is as follows: [$76.30 Medprime payment – ($0 true government amount due after applying patient copay) = $76.30 GHP Overpayment amount]. The GHP overpaid by $76.03 on this prescription based on the falsely inflated U&C price reported by USA Drug, and the patient with government coverage overpaid by $2.05 ($30 copay - $27.95 cash price) compared to a cash-paying customer without insurance.

| Store: | Med-X #6142 Moore, OK | **Tamsulosin 0.4mg 30 count** | |
|---|---|---|---|
| Date: | 08/26/11 | Patient Co Payment: | $30.00 |
| Prescription # | 7062550 | GHP Billed | Medprime |
| Cash Price: | $27.95 | GHP Payment | $76.30 |
| Reported U&C Price: | $140.55 | GHP Overpayment | $76.30 |

### d.   *Bupropn HCL*

187. On February 10, 2011, Med-X #6142, Moore, OK filled prescription number #7034347 for Bupropn HCL 300mg, 30-count tablets through pharmacy tech NM and charged the patient a cash purchase price of $62.29 by cash override. The U&C Price reported to third parties was $157.04, as demonstrated by prescription number #7032443 filled February 5, 2011 and billed to GHP Humana Part D. Based on USA Drug's reported fraudulent, inflated U&C price, under the Humana Part D reimbursement methodology the patient copay was $37 and Humana Part D paid

$42.85. The GHP damages calculation is as follows: [$42.85 Humana D payment – $25.29 true government amount payable ($62.29 cash price - $37.00 copay) = $17.56 GHP Overpayment amount]. The GHP overpaid by $17.56 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $42.85 instead of $25.29

| Store: | Med-X #6142 Moore, OK | **Bupropn HCL 300mg XL 30 count** | |
|---|---|---|---|
| Date: | 02/10/11 | Patient Co Payment: | $37.00 |
| Prescription # | 7034247 | GHP Billed | Humana D |
| Cash Price: | $62.29 | GHP Payment | $42.85 |
| Reported U&C Price: | $157.04 | GHP Overpayment | $17.56 |

*e.*     *Metoprolol Succ*

188.  On February 7, 2011, Med-X #6142, Moore, OK filled prescription number #7028525 for Metoprolol Succ 25mg, 30-count tablets through pharmacy tech DF and charged the patient a cash purchase price of $19.89 by cash override. The U&C Price reported to third parties was $37.61, as demonstrated by prescription number #7039382 filled February 4, 2011 and billed to GHP Secure D.  Based on USA Drug's reported fraudulent, inflated U&C price, under the Secure D reimbursement methodology the patient copay was $5 and Secure D paid $19.89. The GHP damages calculation is as follows:  [$21.16 Secure D payment – $14.89 true government amount payable ($19.89 cash price - $5 copay) = $6.27 GHP Overpayment amount]. The GHP overpaid by $6.27 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $21.16 instead of $14.89 ($19.89 cash price - $5 copay).

| Store: | Med-X #6142 Moore, OK | **Metoprolol Succ 25mg ER 30 count** | |
|---|---|---|---|
| Date: | 02/07/11 | Patient Co Payment: | $5.00 |
| Prescription # | 7028525 | GHP Billed | Secure D |
| Cash Price: | $19.89 | GHP Payment | $21.16 |
| Reported U&C Price: | $37.61 | GHP Overpayment | $6.27 |

*f.*    ***Morphine Sul***

189.    On July 15, 2011, Med-X #6142, Moore, OK filled prescription number #2006714 for Morphone Sul 100mg, 60-count tablets through pharmacy tech KAC and charged the patient a cash purchase price of $56.17 by cash override. The U&C Price reported to third parties was $300.39, as demonstrated by prescription number #2006611 filled July 8, 2011 and billed to GHP Secure D. Based on USA Drug's reported fraudulent, inflated U&C price, under the Secure D reimbursement methodology the patient copay was $10.13 and Secure D paid $57.37. The GHP damages calculation is as follows: [$57.37 Secure D payment – $46.04 true government amount payable ($56.17 cash price - $10.13 copay) = $11.33 GHP Overpayment amount]. The GHP overpaid by $11.33 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $57.37 instead of $46.04.

| Store: | Med-X #6142 Moore, OK | **Morphine Sul 100mg ER 60 count** | |
|---|---|---|---|
| Date: | 07/15/11 | Patient Co Payment: | $10.13 |
| Prescription # | 2006714 | GHP Billed | Secure D |
| Cash Price: | $56.17 | GHP Payment | $57.37 |
| Reported    U&C Price: | $300.39 | GHP Overpayment | $11.33 |

### 3. 2012 Examples

*a.*    ***Clopidogrel***

190.    On September 23, 2012, Med-X #6142, Moore, OK filled prescription number #7103491 for Clopidogrel 75mg, 30-count tablets through tech KAC and charged the patient a cash purchase price of $15.00 by cash override. The reported U&C was $186.59, as demonstrated by prescription number #7093705 filled September 19, 2012 and billed to GHP Medicare D 004336. Based on USA Drug's reported fraudulent, inflated U&C price, under the Secure D reimbursement methodology the patient copay was $73.99 and Secure D paid $12.04. The GHP damages calculation is as follows: [$12.04 Medicare D payment copay – $0 owed after applying copay =

$12.04 GHP Overpayment amount].  The government overpaid by $12.04 on this prescription based on the falsely inflated U&C price reported by USA Drug; the government should have paid nothing after the patient covered the $15 cash price.  Even more egregious is the harm to the patient.  A patient with government coverage paid a $73.99 copay, while a cash-paying customer without insurance paid $15.00.  The patient copay was thus inflated by $58.99 ($73.99 copay - $15 cash price).

| Store: | Med-X #6142 Moore, OK | Clopidogrel 75mg 30 count | |
|---|---|---|---|
| Date: | 09/23/12 | Patient          Co Payments: | $73.99 |
| Prescription # | 7103491 | GHP Billed | Medicare    D 004336 |
| Cash Price: | $15.00 | GHP Payment | $12.04 |
| Reported U&C Price: | $186.59 | GHP Overpayment Patient Overpayment | $12.04 $58.99 |

*b.*     *Diazepam*

191.  On October 1, 2012, Med-X #6142, Moore, OK filled prescription number #4032916 for Diazepam 10mg, 100-count tablets through pharmacy tech LB and charged the patient a cash purchase price of $13.39 by cash override. A contemporaneous prescription was filled for 90-count Diazepam, so the adjusted price after conversion is $12.05 ($13.39 x .90). The U&C Price reported to third parties was $37.23, as demonstrated by prescription number #4031079 filled October 2, 2012 and billed to GHP DHS OK. Based on USA Drug's reported fraudulent, inflated U&C price, under the DHS OK reimbursement methodology the patient copay was $1.20 and DHS OK paid $16.94.  The GHP damages calculation is as follows:  [$16.94 DHS payment − $10.85 true government amount payable ($12.05 cash price - $1.20 copay) = $6.09 GHP Overpayment amount]. The GHP overpaid by $6.09 on this prescription based on the falsely inflated U&C price

reported by USA Drug, paying $16.94 instead of paying $10.85 after the patient's $1.20 copay was applied to a $12.05 cash price.

| Store: | Med-X #6142 Moore, OK | Diazepam 10mg 90 count | |
|---|---|---|---|
| Date: | 10/01/12 | Patient Co Payment: | $1.20 |
| Prescription # | 4032916 | GHP Billed | DHS OK |
| Cash Price: | $12.05 (adjusted) | GHP Payment | $16.94 |
| Reported U&C Price: | $37.23 | GHP Overpayment | $6.09 |

### c.   *Gabapentin*

192. On September 28, 2012, Med-X #6142, Moore, OK filled prescription number #7104168 for Gabapentin 800mg, 90-count tablets through pharmacy tech KAC and charged the patient a cash purchase price of $53.06 by cash override. The reported U&C price was $163.19, as demonstrated by prescription number #7097032 filled September 17, 2012 and billed to GHP Medicare D 004336. Based on USA Drug's reported fraudulent, inflated U&C price, under the Medicare D 004336 reimbursement methodology the patient copay was $1.10 and Medicare D 004336 paid $89.27. The GHP damages calculation is as follows: [$89.27 Medicare D 004336 payment – ($53.06 cash price - $1.10 copay) = $37.31 GHP Overpayment amount]. The GHP overpaid by $37.31 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $89.27 instead of $51.96 after the patient's $1.10 copay was applied to a $53.06 cash price.

| Store: | Med-X #6142 Moore, OK | Gabapentin 800mg 90 count | |
|---|---|---|---|
| Date: | 09/28/12 | Patient Co Payment: | $1.10 |
| Prescription # | 7104168 | GHP Billed | Medicare D 004336 |
| Cash Price: | $53.06 | GHP Payment | $89.27 |
| Reported U&C Price: | $163.19 | GHP Overpayment | $37.31 |

## H. Brand Drug Representative Examples

### 1. Qualaquin

193. On July 13, 2010, Med-X #6142, Moore, OK filled prescription number #7015385 for Qualaquin 324mg, 30-count tablets through pharmacy tech AH and charged the patient a cash purchase price of $168.99 by cash override. The U&C Price reported to third parties was $212.35, as demonstrated by prescription number #7002565 filled July 23, 2010 and billed to GHP TriCare. Based on USA Drug's reported fraudulent, inflated U&C price, under the Tricare reimbursement methodology the patient copay was $9 and Tricare paid $162.70. The GHP damages calculation is as follows: [$162.70 TriCare payment − ($168.99 cash price - $9 copay) = $2.71 GHP Overpayment amount]. The government overpaid by $2.71 on this brand prescription based on the falsely inflated U&C price reported by USA Drug.

| Store: | Med-X #6142 Moore, OK | Qualaquin 324 mg 30 count (BRAND DRUG) | |
|---|---|---|---|
| Date: | 07/03/10 | Patient Co Payment: | $9.00 |
| Prescription # | 7015385 | GHP Billed | Tri Care |
| Cash Price: | $168.99 | GHP Payment | $162.70 |
| Reported U&C Price: | $212.35 | GHP Overpayment | $2.71 |

### 2. Enablex

194. On May 6, 2011, Med-X #6142, Moore, OK filled prescription number #7042216 for Enablex 7.5mg, 30-count tablets through tech DF and charged the patient a cash purchase price of $147.89 by cash override. The reported U&C was $178.21, as demonstrated by prescription number #7037642 filled May 2, 2011 and billed to GHP CCRX. Based on USA Drug's reported fraudulent, inflated U&C price, under the CCRZ reimbursement methodology the patient copay was $3,30 and CCRX paid $146.60. The GHP damages calculation is as follows: [$146.60 CCRX payment − ($147.89 cash price - $3.30 copay) = $2.01 GHP Overpayment amount]. The

64

government overpaid by $2.01 on this prescription based on the falsely inflated U&C price reported by USA Drug; the government should have paid $144.59 instead of 146.60 after applying a $3.30 copay to the $147.89 cash price.

| Store: | Med-X #6142 Moore, OK | Enablex 7.5mg 30 count (BRAND DRUG) | |
|---|---|---|---|
| Date: | 05/06/11 | Patient Co Payment: | $3.30 |
| Prescription # | 7042216 | GHP Billed | CCRX |
| Cash Price: | $147.89 | GHP Payment | $146.60 |
| Reported U&C Price: | $178.21 | GHP Overpayment | $2.01 |

### 3. Lantus Insulin

195. On March 26, 2011, Med-X #6142, Moore, OK filled prescription number #7039267 for Lantus Insulin, 10-count through pharmacy tech LS and charged the patient a cash purchase price of $107.85 by cash override. The U&C Price reported to third parties was $128.34, as demonstrated by prescription number #7017801 filled March 31, 2011 and billed to GHP DHS OK. Based on USA Drug's reported fraudulent, inflated U&C price, under the DHS OK reimbursement methodology the patient copay was zero and DHS paid $108.93. The GHP damages calculation is as follows: [$108.93 DHS payment – $107.85 cash price = $1.08 GHP Overpayment amount]. There was no patient copay. The GHP overpaid by $1.08 on this prescription based on the falsely inflated U&C price reported by USA Drug.

| Store: | Med-X #6142 Moore, OK | Lantus Insulin 10 count (BRAND DRUG) | |
|---|---|---|---|
| Date: | 03/26/11 | Patient Co Payments: | $0.00 |
| Prescription # | 7039267 | GHP Billed | OK DHS |
| Cash Price: | $107.85 | GHP Payment | $108.93 |
| Reported U&C Price: | $128.34 | GHP Overpayment | $1.08 |

4. **Levemir Flex Pen**

196.   On February 21, 2011, Med-X #6142, Moore, OK filled prescription number #7033901for Levemir Flex Pen, 15-count through pharmacist CP and charged the patient a cash purchase price of $195.59 by cash override. The reported U&C price was $247.36, as demonstrated by prescription number #7026298 filled February 15, 2011 and billed to GHP PERX. Based on USA Drug's reported fraudulent, inflated U&C price, under the PERX reimbursement methodology the patient copay was $20 and PERX paid $182.16. The GHP damages calculation is as follows: [$182.16 PERX payment – ($195.59 cash price - $20.00 copay) = $6.57 GHP Overpayment amount]. The GHP overpaid by $6.57 on this prescription based on the falsely inflated U&C price reported by USA Drug, paying $182.16 instead of $175.59 after the patient's $20.00 copay was applied to a $195.59 cash price.

| Store: | Med-X #6142 Moore, OK | Levemir Flex Pen 15 count (BRAND DRUG) | |
|---|---|---|---|
| Date: | 02/21/11 | Patient Co Payment: | $20.00 |
| Prescription # | 7033901 | GHP Billed | PERX |
| Cash Price: | $195.59 | GHP Payment | $182.16 |
| Reported U&C Price: | $247.36 | GHP Overpayment | $6.57 |

## VII.
### COUNT ONE – FCA §3729(a)(1)(A)

197.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 196 of this complaint.

198.   This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

199.   By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States. The United States,

66

unaware of the falsity of the claims, paid Defendants for claims that would otherwise not have been allowed.

200. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## VIII.
## COUNT TWO – FCA §3729(a)(1)(B)

201. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 200 of this complaint.

202. This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

203. By means of the acts described above, Defendants have knowingly made, used, or caused to be made or used, false records and statements to get false or fraudulent claims paid by the United States. The United States, unaware of the falsity of the records and statements, paid Defendants for claims that would otherwise not have been allowed.

204. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## IX.
## COUNT THREE – VIOLATIONS OF STATE LAWS

205. Relator re-alleges the allegations made in paragraphs 1 through 204 of this complaint.

206. Defendants' actions, as alleged in this complaint, constitute violations of the analogous false claims acts and health care fraud remedial statutes of each of the Plaintiff States, to the substantial damage of the Medicaid programs of each Plaintiff State.

207. By reason of these payments, the Plaintiff States have been damaged, and continue to be damaged, in a substantial amount.

## X.
## JURY DEMAND

208.  Plaintiffs demand a trial by jury.

Wherefore, the Relator prays (a) that the United States recover from the Defendants, three times the amount of its damages, together with the maximum civil penalty for each violation of the federal False Claims Act committed by the Defendants; (b) that each Plaintiff State recover from the Defendants all damages, multiples of damages, civil penalties, and other civil remedies recoverable by reason of each violation of that state's laws; and (c) that the Relator be awarded by the United States and the Plaintiff States, as his share of the proceeds of this action, the maximum relator's share permitted by the federal False Claims Act and the analogous statutes of each Plaintiff State, and that he recover from the Defendants his reasonable attorneys' fees, expenses, costs, and all other civil remedies provided by the federal False Claims Act and the analogous statutes of each Plaintiff State.

Respectfully Submitted:

Gaylon C. Hayes
Oklahoma Bar No. 14492
Wayne Allison
Oklahoma Bar No. 21933
6805 S. Western, Suite 500
Oklahoma City, OK 73139
Telephone: (405) 616-5045
Fax: (405) 616-5062
E-Mail: gaylon@hhhlawfirm.com
E-Mail: wayne@allisonlegal.com

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 West
Suite 217-766
San Antonio, Texas 78257-1160

Telephone: (210) 271-3888
E-Mail: glenn@gglawtx.com

Rand J. Riklin
Texas Bar No. 16924275
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Riklin@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

Jason Idell
Texas Bar No. 24055714
Idell PLLC
6800 Westgate Blvd. Suite 132-301
Austin, TX 78715
Phone: (512) 689-3081
E-mail: jason@idellpllc.com

*Attorneys for Relator*

## CERTIFICATE OF SERVICE

The undersigned certifies that on _____, 2016, a copy of the foregoing First Amended Complaint and the required disclosure statement was served on each of the following persons by the method of service indicated:

Hon. Loretta Lynch                                   *Via USPS Certified*
Attorney General of the United States
Civil Division/Fraud Section
Commercial Litigation Branch
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

69

Ms. Marianne Hardcastle     ***Via Hand Deliver***
Assistant United States Attorney
The United States Attorney's Office
Northern District of Oklahoma
110 W. 7th Street, Suite 300
Tulsa, Oklahoma 74119

Hon. E. Scott Pruitt       ***Via USPS***
Attorney General of the State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

Hon. Herbert H. Slatery III     ***Via USPS***
Attorney General of the State of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207

Mr. Christopher Robinson
Ms. Niki Batt        ***Via USPS***
Director, MFCU
Medicaid Fraud Control Unit of Oklahoma
Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105

_____
GAYLON C. HAYES